UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRIDGETTE BRYAN and SPIN-LEARNING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ASCEND LEARNING, LLC, ASSESSMENT TECHNOLOGIES INSTITUTE, L.L.C., SCOTT NOVORR, AND SANDRA MILLER,<br><br>Defendants. | * | Civil Action No. 24-cv-10583-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Bridgette Bryan ("Bryan") and SPIN-Learning, LLC ("SPIN") (together with Bryan, "Plaintiffs") bring this action against Bryan's former employer, Ascend Learning, LLC ("Ascend"), and its subsidiary, Assessment Technologies Institute ("ATI," and, together with Ascend, the "Company"), as well as two individuals employed by ATI, Scott Novorr ("Novorr"), and Sandra Miller ("Miller") (collectively with the Company, "Defendants"), alleging federal antitrust violations (Count I), various state tort violations (Counts II–IV), and violations of Massachusetts General Laws Chapter 93A ("93A") (Count V). Currently pending before the Court are Defendants' special motion to dismiss under the Massachusetts Strategic Litigation Against Public Participation ("Anti-SLAPP") statute, Mass. Gen. Laws ch. 231, § 59H, and motion to dismiss for failure to state a claim. [ECF No. 17]. For the reasons set forth below,

Defendants' special motion is **DENIED**. Defendants' motion to dismiss for failure to state a claim, however, is **GRANTED**.

## I. BACKGROUND

The following relevant facts are taken primarily from the well-pleaded allegations in Plaintiffs' Complaint, [ECF No. 1 ("Complaint") or ("Compl.")], which the Court, as it must, assumes to be true, drawing all reasonable inferences in Plaintiffs' favor, when considering a motion to dismiss. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

### A. Factual Background

#### 1. Bryan's Employment with the Company

In or around June or July 2010, Bryan began working for the Company as a part-time contractor/nurse educator. [Compl. ¶ 23]. On or around January 2, 2011, Bryan transitioned to being full-time at the Company, working as an LR Educator/ National Council Licensure Examination ("NCLEX") Specialist in the Research & Development Department and, not long after that, was promoted to a management position within the Company. [Id. ¶¶ 24, 26]. Bryan was again promoted in or around December 2018, this time to Director of NCLEX Services. [Id. ¶ 28].

In total, Bryan was employed by the Company, full-time, for approximately eleven and a half years. [Compl. ¶ 30]. During that time, she had "full and unfettered access" to her Company personnel file. [Id. ¶ 31]. As detailed further infra, Bryan alleges that she was never required to sign an employment agreement, confidentiality agreement, non-compete agreement, and/or intellectual property agreement, that she did not sign such an agreement, and that she did not observe such an agreement in her personnel file. [Id. ¶¶ 25, 27, 29, 32, 40].

Bryan resigned from the Company on May 2, 2022. [Compl. ¶ 33]. The Company did not conduct an exit interview, provide any severance or other agreement for Bryan to sign, and did not offer her "garden leave." [Id. ¶ 34]. Sometime between May 2, 2022 and May 27, 2022, someone at the Company allegedly forged Bryan's signature on a "Confidentiality, Inventions, and Non-Solicitation Agreement" (the "Agreement") after employees in the Company's Human Resources Department were reprimanded because they were unable to locate such an agreement for Bryan. [Id. ¶¶ 41–42].[1] On or about May 27, 2022, Bryan received a "cease and desist" letter from the Company's counsel (the "May 2022 Letter") demanding that she cease and desist from any violations of the Agreement. [Id. ¶ 35]. Bryan was shocked to receive the May 2022 Letter and perplexed by the reference to the Agreement, which was not included with the May 2022 Letter. [Id. ¶ 36]. Bryan's counsel contacted the Company's counsel and requested a copy of the Agreement, and, after many weeks of no response, the Company's counsel emailed Bryan's counsel a copy, with the allegedly forged signature. [Id. ¶¶ 37–38].

**2. SPIN-Learning**

On January 22, 2022, Bryan filed a Certificate of Formation to form SPIN as a Mississippi limited liability company. [Compl. ¶ 45]. SPIN offers academic coaching services, a telephone application that offers daily services to students, a SPIN-Academy with engaging modules, and a faculty resource center, among other things. [Id. ¶ 47]. SPIN employs one part-time employee, Dianne Harris ("Harris"). [Id. ¶ 49]. To date, SPIN has had only one

[1] As discussed infra, in a related lawsuit, Bryan previously brought claims for fraud against the Company on the grounds that her signature was forged, and the Court dismissed these claims for failure to sufficiently plead fraud under Federal Rule of Civil Procedure 9(b). For the sole purpose of ruling on this motion to dismiss, and in the absence of any argument from Defendants that it should not, the Court credits Plaintiffs' forgery allegations. The impact of those allegations is discussed where relevant to Plaintiffs' claims in this action.

institutional customer, Ivy Tech Community College ("Ivy Tech"), which paid SPIN approximately $2,980.00. [Id. ¶ 50].

### 3. The Company Lawsuit

On November 21, 2022, the Company filed a separate Complaint in this Court (and a first Amended Complaint on January 5, 2023), captioned Ascend Learning, LLC and Assessment Technologies Institute, L.L.C. v. Bridgette Bryan and SPIN-Learning, LLC, No. 22-cv-11978 (the "Company Lawsuit"). [Compl. ¶ 53]. The Company Lawsuit "made allegations against the Plaintiffs for alleged copyright infringement and breach of the . . . Agreement, among other claims." [Id. ¶ 54]. Specifically, in addition to a copyright infringement claim, Defendants sued Bryan and Spin-Learning, LLC for alleged breach of the Agreement in various forms including: breach of the duty of loyalty, breach of intellectual property rights, breach of non-solicitation of employees, breach of non-solicitation of customers, and breach of confidentiality. See generally [Company Lawsuit, ECF No. 18].[2] Defendants also brought a claim for tortious interference with contractual relationships, based on Plaintiffs' alleged inducement of other Company employees to breach their employment agreements; and another claim for tortious interference with contractual and advantageous business relationships, based on Plaintiffs' alleged interference with the Company's agreements and relationships with its customers. [Id.].

---

[2] "[W]hen reviewing a motion to dismiss for failure to state a claim, a court may consider matters of public record[,]" Spencer v. Dookhan, 2017 WL 2785423, at *1 n. 2 (D. Mass. June 27, 2017) (quoting Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 1993)), including "dockets and pleadings" in previously filed cases, id., as well as "documents sufficiently referred to in the complaint," as the Company Lawsuit documents are here, Dew v. City of Bos., 405 F. Supp. 3d 294, 298 (D. Mass. 2019) (quoting Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 1993)).

In late January 2023, SPIN and Bryan filed a motion to dismiss the Company Lawsuit, both for lack of personal jurisdiction and for failure to state a claim. [Company Lawsuit, ECF No. 22]. On August 16, 2023, this Court dismissed the suit as to SPIN for lack of personal jurisdiction. [Company Lawsuit, ECF No. 39]. All claims against Bryan survived the motion to dismiss. [Id.].

When answering the Company Lawsuit, Bryan filed counterclaims for fraud, forgery, and civil conspiracy, alleging for the first time that her signature on the Agreement was forged by the Company. [Compl. ¶ 55; Company Lawsuit, ECF No. 40]. The Company moved to dismiss the counterclaims, and they were dismissed for failure to state a claim. [Company Lawsuit, ECF Nos. 44, 158].

Pursuant to this Court's order, discovery in the Company Lawsuit could begin twenty-one days after the ruling on the motion to dismiss, or September 6, 2023. [Company Lawsuit, ECF No. 38]. The parties engaged in extensive discovery and filed cross-motions for summary judgment on July 19, 2024. [Company Lawsuit, ECF Nos. 150, 155]. Those motions are pending.

**4. Events Following Initiation of the Company Lawsuit**

At some point after filing its lawsuit,[3] the Company held a company-wide meeting to inform its employees of the lawsuit. [Compl. ¶ 56]. Company employees were warned to have no contact with Bryan or SPIN, even for non-company-related matters. [Id. ¶ 57].

---

[3] The Complaint is unclear as to when this meeting occurred, other than to say it was "after the Company filed its Lawsuit." [Compl. ¶ 56].

Around approximately November 23, 2023,[4] ATI shared details of the Company Lawsuit with its regional Vice Presidents and instructed them to advise ATI customers and/or prospective customers of SPIN that the Plaintiffs had stolen ATI products, and to refrain from contact with SPIN or its workers. [Compl. ¶ 64]. From November 23, 2023 to November 28, 2023, there was a sudden spike in Google searches for SPIN, which coincides with the period in which the Company's representatives were directed to inform educational institutions of the pending lawsuit and accusations against Bryan and SPIN. [Id. ¶ 66].

On multiple occasions during the pendency of the Company Lawsuit, the Company, including Novorr and Miller, sent emails and/or made phone calls to prospective SPIN customers to advise them of the pending Company Lawsuit and to warn them that Plaintiffs "stole ATI's products." [Compl. ¶¶ 73–75]. For example, on one occasion, Novorr informed the director of the nursing program at Bethel University in Minnesota, Delicia Parker ("Parker"), that Bryan had violated her non-compete with ATI and misused ATI's proprietary information to develop SPIN, as well as that ATI would be sending subpoenas to any schools which ATI believed SPIN was marketing. [Id. ¶ 75]. On another occasion "in or around late 2023," Miller called a nursing coordinator at Stanbridge University in Irvine, CA, Kathryn Meglitsch-Tate ("Tate") to advise her of the Company lawsuit. [Id. ¶¶ 83, 85–87]. During that conversation, Miller asked, "Don't you think it's odd [Bryan] left ATI and has a business with all these questions?" [Id. ¶ 87]. Miller also told Tate not to tell Plaintiffs about her call. [Id. ¶ 88]. On a third occasion, an "ATI

---

[4] The Complaint does not specify when ATI shared these details with its regional VPs and instructed them to advise customers about the Company Lawsuit. Given that Plaintiffs connect this directive to the uptick in Google search activity related to SPIN that occurred from November 23, 2023 and November 28, 2023, [Compl. ¶ 66], the Court, in construing the allegations most favorably to Plaintiff, assumes this meeting occurred at or near November 23, 2023.

representative" contacted the director of a nursing program at the University of West Florida ("UWF") and informed them that the Company was suing Bryan because she "stole" company products. [Id. ¶ 89]. The UWF employee informed the school's legal counsel of the call, and UWF subsequently received a subpoena from the Company. [Id. ¶ 90]. Shortly thereafter, one of SPIN's advisory committee members, who also worked for UWF, abruptly terminated her affiliation with SPIN. [Id. ¶ 91].

On or about December 11, 2023, the Company sent multiple "Keeper of the Records" subpoenas to schools the Company believed SPIN was marketing. [Compl. ¶ 60]. The subpoenas sought all communications and/or documents by and between the school and SPIN and/or Bridgette Bryan and/or anyone with an @spin-learning.com email address. [Id.].

In late January 2024, SPIN was disinvited without explanation from a curriculum meeting scheduled for in or around March 2024 at Ivy Tech, SPIN's only institutional customer. [Compl. ¶¶ 50, 81]. Ivy Tech falls within Novorr's geographical region in his position at ATI. [Id. ¶ 78].

### B. Procedural History

Plaintiffs filed the operative complaint in this action on March 7, 2024. See generally [Compl.]. Defendants moved to dismiss on May 8, 2024, [ECF No. 17], Plaintiffs opposed on June 5, 2024, [ECF No. 23], and Defendants filed a reply in support of their motion on June 20, 2024, [ECF No. 27].

## II. MOTION TO DISMISS PURSUANT TO THE ANTI-SLAPP STATUTE

### A. Legal Standard

The Massachusetts Anti-SLAPP statute permits a party to bring a special motion to dismiss when the allegations against it "are based on said party's exercise of its right of petition

under the constitution of the United States or of the commonwealth." Mass. Gen. Laws ch. 231, § 59H (2022). That said, "while the statute's applicability turns on the special motion proponent's constitutional rights of petition, the statute does not 'rely solely on these rights, as defined by the United States Supreme Court or this court, to determine the scope of protected activity, and instead provides its own express - and broad - definition of "petitioning."'" Bristol Asphalt, Co. v. Rochester Bituminous Prod., Inc., 227 N.E.3d 1019, 1032 (Mass. 2024) (quoting Commonwealth v. Exxon Mobil Corp., 489 Mass. 724, 727 n.3, 187 N.E.3d 393 (2022)).

The Massachusetts Supreme Judicial Court has laid out a two-stage burden-shifting procedure for such special motions to dismiss. Under "[s]tage one," the proponent of the special motion to dismiss "must make a threshold showing through the pleadings and affidavits that the claims against it are 'based on' the party's petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." Bristol, 227 N.E.3d at 1036–37 (cleaned up). "In order to determine if statements are petitioning, [courts] consider them in the over-all context in which they were made." N. Am. Expositions Co. Ltd. P'ship v. Corcoran, 898 N.E.2d 831, 841 (Mass. 2009). While "[t]he typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects," Duracraft Corp. v. Holmes Prods. Corp., 691 N.E.2d 935, 940 (Mass. 1998), the statute provides for broader protection in certain situations. Some "[t]ypical categories of petitioning activities include 'reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations.'" Riverdale Mills Corp. v. Cavatorta N. Am., Inc., 189 F. Supp. 3d

317, 324 (D. Mass. 2016) (quoting Cadle Co. v. Schlichtmann, 859 N.E.2d 858, 864 (Mass. 2007)).

If the proponent makes this threshold showing, at "[s]tage two," "the statute requires allowance of the special motion to dismiss, 'unless the [special motion opponent] shows' that the special motion proponent's exercise of its right of petition 'was devoid of any reasonable factual support or any arguable basis in law' and [] 'caused actual injury to the [special motion opponent].'" Bristol, 227 N.E.3d at 1038, 1041 (quoting Mass. Gen. Laws ch. 231, § 59H (2022)) (first, second, and fourth alterations in original). At this stage, "when the special motion opponent has submitted evidence and argument challenging the reasonableness of the factual and legal basis of the petitioning, a special motion proponent cannot merely rely on speculation, conclusory assertions, or averments outside of its personal knowledge for the court to identify reasonable support." Id. at 1039.

### B. Discussion

Defendants argue that Plaintiffs' tortious interference (Count II), defamation (Count III), and commercial disparagement (Count IV) claims "are solely based on Defendants' protected petitioning activities – informing a small, select group of the Company's own customers, which the Company understood Bryan and SPIN to be soliciting, that they would be receiving third-party subpoenas related to the Company Lawsuit, and, in connection with the same, informing this small group of Company customers about the Company Lawsuit." [ECF No. 18 at 13–14]. Defendants assert that filing the Company Lawsuit is the sort of "quintessential petitioning activity" that the anti-SLAPP statute immunizes. [Id. at 14]. Plaintiffs respond that "[w]hile it may be that some of the false statements and tortious acts of the Defendants were repeated within the context of the [Company Lawsuit], the Defendants have also employed a variety of

nonpetitioning tactics to defame and interfere with the business of the Plaintiffs including, but not limited to, affirmatively telephoning and/or emailing prospective customers of SPIN and making false and/or misleading statements about the nature of the ATI Lawsuit and SPIN's business." [ECF No. 23 at 6].

Defendants' argument that filing the Company Lawsuit constitutes "quintessential petitioning activity" misses the mark. Plaintiffs' allegations, as pled, are focused not on Defendants' filing the lawsuit but instead on their emails and telephone calls informing their customers, who were also SPIN's potential clients, that they had filed the lawsuit, that Plaintiffs "stole" Company products, and that the customers could be receiving subpoenas pursuant to that lawsuit. Although Defendants are correct that filing a lawsuit can constitute petitioning activity, Rosario v. Caring Bees Healthcare, Inc., 209 N.E.3d 63 (Mass. App. Ct. 2023), they provide no case law to support the proposition that commercial outreach regarding private civil litigation, even if intended to alert the customers to potential subpoena requests, constitutes "petitioning activity" under the Massachusetts anti-SLAPP law, and the Court, after conducting its own research, is not aware of any such authority. See, e.g., Riverdale, 189 F. Supp. 3d at 325 (holding emails sent to customers alerting them to a lawsuit pursuant to which they might be receiving subpoenas were not petitioning activity under Massachusetts anti-SLAPP law when the moving and non-moving party were "direct competitors" and only one customer was actually subpoenaed); Cadle Co., 859 N.E.2d at 867 ("attorney may not claim protection of the anti-SLAPP statute for publishing statements about an adversary at will, in hopes of shoring up his or her own position, attracting potential clients, or otherwise gaining a tactical advantage in an ongoing legal proceeding"). Although a close call, in the absence of such authority, the Court declines to find that the Massachusetts Supreme Judicial Court would immunize such private,

third-party communication regarding a lawsuit pending against a direct competitor. Defendants' special motion to dismiss is therefore **DENIED**.

## III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard requires "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Cardigan Mt. Sch., 787 F.3d at 84 (further internal quotations and citation omitted) (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." García-Catalán, 734 F.3d at 103 (internal quotations and citation omitted). In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

**B. Discussion**

**1. Antitrust Violations (Count I)**

Plaintiffs bring one claim for "[v]iolations of the Sherman Act and Clayton Act," [Compl. ¶¶ 95–106 (Count I)], but they fail to specify in the Complaint which statutory provisions Defendants allegedly violated, [ECF No. 18 at 14–15]. Then, in their opposition to Defendants' motion to dismiss, they unhelpfully cite to both Sections 1 and 2 of the Sherman Act. See [ECF No. 23 at 10, 17]. Even reading the Complaint generously,[5] the Court cannot discern any allegations of concerted action that would support a Section 1 violation, which prohibits anticompetitive "agreements."[6] The Court therefore assumes that Plaintiffs' mean to allege a violation of Section 2 of the Sherman Act.

Under Section 2 of the Sherman Act, it is illegal to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To

---

[5] The Complaint alleges at most that the Company and the individual defendants contacted a handful of clients to alert them to the Company Lawsuit and to dissuade them from doing business with Plaintiffs. It does not allege that these clients entered into any agreement, express or implied, to keep Plaintiffs out of the marketplace.

[6] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." See 15 U.S.C. § 1; see also In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 140 n. 46 (D. Mass. 2015), as amended, (Aug. 7, 2015), aff'd, 842 F.3d 34 (1st Cir. 2016) (quoting 15 U.S.C. § 1 (2004)). The First Circuit has explained:

> There are two prerequisites for a successful section 1 claim. First, there must be concerted action. Second, the actors' agreement must involve either restrictions that are per se illegal or restraints of trade that fail scrutiny under the rule of reason.

Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16 (1st Cir. 2004) (internal citations omitted). In other words, "Section 1 by its plain terms reaches only 'agreements'—whether tacit or express." White v. R.M. Packer Co., Inc., 635 F.3d 571, 575 (1st Cir.2011) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553 (2007)).

prove monopolization, a plaintiff must show "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)).[7] "In order to survive a motion to dismiss, a pleading must, as a threshold matter, sketch relevant details of a § 2 claim, such as facts defining the market." C.R. Swaney Co., Inc. v. Atlas Copco N. Am., Inc., No. 85-cv-587, 1987 WL 33025, at *12 (D. Mass. Sept. 25, 1987) (citing Gilbuilt Homes, Inc. v. Continental Homes of New England, 667 F.2d 209, 211 (1st Cir. 1981)); see also Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) ("To determine whether a party has or could acquire monopoly power in a market, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." (internal quotation omitted)). "[W]hen determining if a complaint sufficiently pleads the existence of a monopoly in a market, district courts require specific economic data such as defendant's market share, market trends, entry barriers, geographic market and the defendant's economic power in that market." Aldabe v. Cornell Univ., 296 F. Supp. 3d 367, 374 (D. Mass. 2017), aff'd, No. 17-cv-2180, 2018 WL 7917918 (1st Cir. Dec. 7, 2018) (citing CCBN.Com, Inc. v. Thomson Fin., Inc., 270 F. Supp. 2d 146, 157 (D. Mass. 2003); see also C.R. Swaney, 1987

---

[7] Because Plaintiffs repeatedly plead that the Company already possesses a monopoly, the Court will not address claims for attempted monopolization or conspiracy to monopolize. See, e.g., [Compl. ¶ 22 ("Upon information and reasonable belief, ATI has over 1,900 nursing school customers and maintains a monopoly over its industry"), ¶ 93 ("Upon information and reasonable belief, the Defendants have spread defamatory information throughout the industry – an industry which the Company has monopolized), ¶ 97 ("At all relevant times, the company possessed market power (i.e. 'monopoly power') in its Industry, including the exclusion of competitors from their Industry)"].

WL 33025 at *13 ("While it may have been preferable to make more specific allegations as to market share . . . at this early stage of the litigation an allegation of 'market dominance' in a particular product and geographic area is sufficient to survive a motion to dismiss.").

Defendants argue that Plaintiffs' antitrust claims fail because Plaintiffs do not define the relevant market that Defendants allegedly monopolize. [ECF No. 18 at 16–18]. Specifically, Defendants argue that "[a]ll the Complaint does is define an 'Industry' as 'nursing schools in the United States [that] use [ATI's] products'" and that "the 'products ATI sells' is not a relevant market." [Id. at 17]. Plaintiffs respond that the Complaint defines the relevant market as "nursing education and, in particular, Ascend and ATI's products and services used by nursing programs to assist nursing students in mastering the curriculum, graduating from nursing school, passing the NCLEX, and developing practical experience." [ECF No. 23 at 12 (citing Compl. ¶¶ 3, 20–21)].

In essence, both Plaintiffs and Defendants agree that, at most, Plaintiffs have defined the relevant market as nursing schools in the United States that use the Company's products. This purported market definition "fails to mark with specificity the limits of the relevant market." Philips Med. Sys. P.R., Inc. v. Alpha Biomedical & Diagnostic Corp., No. 19-cv-1488, 2020 WL 7029014, at *7 (D.P.R. Nov. 30, 2020). It is, at best, circular, defining the market which Defendants are alleged to monopolize as consisting of schools which use Defendants' products and services. Defendants necessarily monopolize this market because this definition says nothing about the existence of any competing products or companies or the demand within these nursing schools for non-Company products. Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (complaint which "defined the relevant market solely as the market for" competitor's brand of health education materials was inadequate where

it also failed "to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand"). Moreover, other than this purported market definition, the Complaint provides no factual allegations that could be used to define the relevant market. For instance, the Complaint includes no information regarding the geographic boundaries of the market (other than "the United States"), market trends, other products within the market, or facts that would otherwise establish Defendants' market dominance for the purposes of a Section 2 claim.[8] Aldabe, 296 F. Supp. 3d at 374 (dismissing complaint where, even accepting plaintiff's attenuated market definition, plaintiff did not plead facts that defendant had a monopoly).

Because Plaintiffs fail to define the relevant market, Defendant's motion to dismiss Count I is **GRANTED**.

**2. Tortious Interference (Count II)**

Plaintiffs claim tortious interference with prospective business relations, based on the allegation that "SPIN had a prospective business relationship with Ivy Tech, Stanbridge University, Bethel University, and the University of West Florida, among other schools," which failed to materialize when Defendants "with oppression and malice" "contacted an unknown

---

[8] The Complaint does include one allegation to the effect that ATI maintains "an approximate seventy-three percent (73%) ownership of the market in their industry." [Compl. ¶ 3]. Reading this allegation generously as purporting to define market share, the Court still cannot adduce from the Complaint what "market in their industry" Plaintiffs are alleging Defendants monopolize. To the extent Plaintiffs attempt to further define this market in their opposition brief, "[Plaintiffs] cannot bolster the allegations of the [Complaint] through the late addition of new facts in opposing a motion to dismiss." Decoulos v. Town of Aquinnah, No. 17-cv-11532, 2018 WL 3553351, at *12 (D. Mass. July 24, 2018).

number of schools to communicate unproven allegations against" Plaintiffs. [Compl. ¶¶ 107–12 (Count II)].

> Under Massachusetts law, a plaintiff bringing a claim of tortious interference with a [business] relationship must prove that . . . "(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or [business] relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."

Hamann v. Carpenter, 937 F.3d 86, 91, 93 (1st Cir. 2019) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)). In this context, "Massachusetts courts will find the improper motive element met when a defendant exhibits 'actual malice' or 'a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest.'" Id. at 90 (quoting Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43 (1st Cir. 2011). "On the other hand, the mere desire to benefit oneself or one's principal will not suffice" to demonstrate improper motive. Id.; see also inVentiv Health Consulting, Inc. v. Equitas Life Scis., 289 F. Supp. 3d 272, 284 (D. Mass. 2017) (stating that the "'legitimate advancement of [defendant's] own economic interest' does not constitute an improper motive" (quoting Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 246 (Mass. App. Ct. 2004))). Moreover, the alleged improper conduct "must extend 'beyond the interference itself.'" inVentiv, 289 F. Supp. 3d at 283 (quoting Cavicchi v. Koski, 855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006)). "Violation of 'a statute or a rule of common law' or use of threats, misrepresentations of facts or 'other improper means' provides a sufficient improper motive or means." Id. (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990)).

Defendants argue that, even if Plaintiffs have pled a prospective business relationship with any of the schools mentioned in the Complaint (and Defendants do not concede that they

have), Plaintiffs have failed to show that any alleged interference by Defendants was improper in motive or means. [ECF No. 18 at 25]. The Court agrees.

Regarding motive, Plaintiffs offer only conclusory allegations parroting the elements of their tortious interference claim. See, e.g., [Compl. ¶ 65 ("Upon information and reasonable belief, the company launched a 'smear' campaign against the Plaintiffs to stifle SPIN's business"), ¶ 72 ("[T]he Company has purposefully and intentionally sought to harm both Plaintiffs' reputations in the industry and to outright sever Plaintiffs' business relationships), ¶ 76 ("Upon information and reasonable belief, Mr. Novorr's intent was and is to deter educational institutions from giving SPIN any business and has had the effect of chilling SPIN's business relations.")]. Without more, these conclusory allegations are insufficient. Hamann, 937 F.3d at 90 (plaintiff cannot carry burden as to motive based on "too-conclusory parroting of the improper-motive element"). The most the Court can reasonably infer from the Complaint's factual allegations is that Defendants were attempting to enforce what they perceived to be a legal agreement with Plaintiff, and that they were doing so not to interfere with Plaintiffs' business relationships but to maintain existing business by enforcing their rights under the Agreement. This type of economic motivation does not sound in malice. Id. at 90–91 (where advantageous relationship is prospective, rather than pursuant to an existing contract, "lawful competition generally do[es] not amount to impermissible interference under Massachusetts law").

Moreover, Plaintiffs do not allege any improper conduct beyond Defendants calling SPIN's prospective clients (and the Company's present clients) and alerting them to the Company Lawsuit and its underlying allegations. See Desena v. Burns, 21-P-68, 2022 WL 414144, at *2 (Mass. App. Ct. Feb. 11, 2022) (declining to find that defendant's complaints

about plaintiff to a third party, with whom plaintiff had an indirect business relationship, were "improper in motive or means," where plaintiff failed to show complaints were false or that defendant knew they were false (citing Cavicchi, 855 N.E.2d at 1142 (other citation omitted)). To the extent Plaintiffs are alleging that the improper conduct here was forging Bryan's signature on the Agreement, those allegations sound in fraud and are not pled with sufficient particularity. N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 14 (1st Cir. 2009) (holding tortious interference claim which sounded in fraudulent misrepresentation was subject to Rule 9(b)'s heightened pleading standards). The allegations regarding the forgery are all pled "upon information and reasonable belief" without any specificity as to the source of the information or reasons for the belief, see [Compl. ¶¶ 41–43], which is insufficient under Rule 9(b). Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 275 (D. Mass. 1998). This Court previously dismissed Plaintiffs' counterclaims for fraud based on the forgery in the Company Lawsuit, see [Company Lawsuit, ECF No. 158]. Plaintiff cannot now prevail here by repackaging those same deficiently pled fraud claims as a tortious interference claims in hopes of taking advantage of a lower pleading standard. The underlying "improper conduct" in this case would still be forgery (i.e., fraud), and thus Rule 9(b) would apply.

Because Plaintiffs' fail to plead improper motive or means, Defendants' motion to dismiss Count II is **GRANTED**.

### 3. Defamation (Count III)

To state a claim for defamation under Massachusetts law, a plaintiff must allege: "(1) that '[t]he defendant made a statement, concerning the plaintiff, to a third party'; (2) that the statement was defamatory such that it 'could damage the plaintiff's reputation in the community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he statement either

caused the plaintiff economic loss . . . or is actionable without proof of economic loss.'" Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (alterations in original) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)). "Claims for defamation are subject to the notice pleading requirements set forth in Fed. R. Civ P. 8," and, as such, Plaintiffs "are not required to set forth the alleged defamatory statements verbatim." Hogan v. Teamsters Local 170, 495 F. Supp. 3d 52, 61 (D. Mass. 2020). Plaintiffs are required, however, to set forth the "who, what, when, and where" of the alleged defamatory statements with sufficient particularity to "give Defendants fair notice of the factual basis for Plaintiff's defamation claim." Id. at 61–62; see also Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004) ("[T]he complaint should at least set forth minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally.").

In support of their defamation claim, Plaintiffs here allege that Defendants "on multiple occasions . . . have sent emails and/or made phone calls to prospective SPIN customers to advise the schools of the pending Company Lawsuit and to warn them that the Plaintiffs 'stole ATI's products'" and that these communications "have injured both Plaintiffs' reputations in the community." [Compl. ¶¶ 113–22 (Count III)]. In response, Defendants first argue at that Plaintiffs have not plead sufficient detail to meet the elements of a defamation claim. [ECF No. 18 at 29]. Defendants further argue that, even if Plaintiffs have successfully pled publication, they still "cannot adequately plead a defamation claim" because 1) the statements were not false, and 2) the Complaint includes no "allegations showing Defendants were [even] negligent as to the falsity of their statements." [Id. at 30–31].

Defendants are correct that the majority of Plaintiffs' allegations do not meet the notice pleading requirements of Rule 8 because they fail to plead sufficient facts to give Defendants fair notice of the statements at issue. For instance, the gravamen of Plaintiffs' allegations is that on "multiple occasions," "the Company, including Mr. Novorr and Ms. Miller, [] sent emails and/or made phone calls to prospective SPIN customers to advise the schools of the pending Company Lawsuit and to warn them that the Plaintiffs 'stole ATI's products.'" [Compl. ¶¶ 73, 115]; see also [id. ¶ 82 ("Upon information and reasonable belief, Ivy Tech ended its relationship with SPIN because of Mr. Novorr and the Company's defamatory and derogatory comments."), ¶ 84 ("Ms. Miller also implied to prospective customers of SPIN that Bryan 'stole' products from the Company.")]. Even drawing all reasonable inferences in Plaintiffs' favor, the bulk of these allegations leave key details undefined – namely, who made the allegedly defamatory statements to whom and when – and are thus insufficient. Grant v. Target Corp., 126 F. Supp. 3d 183, 193 (D. Mass. 2015) ("Merely alleging that unnamed Target agents or employees made defamatory statements about the propriety of plaintiff's conduct does not explain the essential 'who, what, when, and where,' and it does not give Target fair notice of the factual basis for plaintiff's defamation claim.").

That said, Plaintiffs do plead three statements with sufficient particularity, all of which were outlined supra in the Court's factual recitation: 1) Novorr's call with Parker informing her of the Company Lawsuit and that "Bryan stole the Company's products," [Compl. ¶¶ 74–75]; 2) Miller's call with Tate, in which she advised her of the Company Lawsuit and stated, "[d]on't you think it's odd [Bryan] left ATI and has a business with all these questions," [id. ¶ 87]; and 3) an ATI representative's telephone call with the University of West Florida, informing them that the "Company was suing Bryan because she 'stole' Company products," [id. ¶ 89]. Taken

together, Plaintiffs allege that Novorr, Miller, and an ATI representative made two types of defamatory statements to certain nursing schools: 1) the Company had filed a lawsuit against Plaintiffs and 2) Plaintiffs "stole" Company products. [Compl. ¶¶ 73, 115].

Although sufficiently particularized, these statements separately fail to state a claim for defamation because Plaintiffs do not plead that Novorr, Miller, or the unnamed ATI representative acted at least negligently in making the statements. "As a matter of constitutional bedrock, a plaintiff must show fault in order to impose liability upon a defendant for defamation." Shay, 702 F.3d at 82. For a true statement, "the plaintiff must prove that the defendant acted with 'actual malice' to recover." Id. (first citing Mass. Gen. Laws ch. 231, § 92 then citing White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 n. 4 (Mass. 2004). And even if "a statement is false, the plaintiff still must show that the defendant acted negligently." Id. (citing Stone v. Essex Cnty. Newspapers, Inc., 330 N.E.2d 161, 168 (Mass. 1975).

Regarding the first bucket of statements, the existence of the Company Lawsuit is clearly not false. As discussed supra, that action, also pending before this Court, alleges that Bryan violated her Employment Agreement by stealing Company products, which is what Plaintiffs contend Defendants told their clients. Because the statements alerting clients to the existence of the Company Lawsuit are in fact true, they cannot form the basis of a defamation claim. Larson v. Dorland, 693 F. Supp. 3d 59, 85 (D. Mass. 2023) ("[T]ruth is an absolute defense to defamation." (citing Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998)). Moreover, outside of the few conclusory allegations as to motive discussed supra in analyzing Plaintiffs' tortious interference claim, Plaintiffs offer no factual allegations that Defendants acted with actual malice in making these statements. See [Compl. ¶¶ 113–22].

As for the second bucket of defamatory statements, Plaintiffs argument seems to be that the statement that Bryan "stole" Company products is false because "although [] Ascend and ATI have outstanding claims against Bryan for copyright infringement, none of those claims have been substantiated, much less proven as true." [ECF No. 23 at 19]. Regardless of whether Bryan is ultimately exonerated for copyright infringement, Plaintiffs have failed to plead here that anyone who made the alleged defamatory statements — namely, Novorr, Miller, and the ATI representative — knew, should have known, or otherwise acted negligently regarding the truth of the Company Lawsuit's allegations or the alleged forgery when they informed Company clients that Bryan was in violation of the Agreement and thus had stolen Company products. See [Compl. ¶¶ 113–22]; see generally [id.]. Although the Complaint alleges that someone at the Company forged Bryan's signature on the Agreement, it includes no factual allegations regarding who at the Company knew this fact, and it certainly does not connect this knowledge to Defendants Novorr or Miller, or the unnamed ATI representative. Without factual allegations evidencing fault, Plaintiffs claim for defamation fails, and Defendants' motion to dismiss Count III is **GRANTED**.

**4. Commercial Disparagement (Count IV)**

Plaintiffs also bring a claim for commercial disparagement, predicated on the same facts as their defamation claim, and which fails for similar reasons as the defamation claim. [Compl. ¶¶ 123–33 (Count IV)]. "[I]n order to prevail on a claim alleging commercial disparagement, a plaintiff must prove that a defendant: (1) published a false statement to a person other than the plaintiff; (2) 'of and concerning' the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special

damages in the form of pecuniary loss." HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013). The Massachusetts Supreme Judicial Court "has noted that the knowledge standard required to prove commercial disparagement 'mirrors what has been termed "actual malice" in the defamation context.'" Lemelson v. Bloomberg LP, 253 F. Supp. 3d 333, 341 (D. Mass. 2017), aff'd, 903 F.3d 19 (1st Cir. 2018) (quoting HipSaver, 984 N.E.2d at 529–30). As discussed infra, Plaintiffs have not pled that any allegedly false statement was published with negligence, much less with actual malice.[9] As such, Defendants' motion to dismiss Count IV is **GRANTED**.

**5. Mass. Gen. Laws Ch. 93A (Count V)**

Plaintiffs additionally bring a claim for violations of Mass. Gen. Laws ch. 93A. [Compl. ¶¶ 134–37 (Count V)]. Plaintiffs, however, do not provide an independent basis for the 93A violations, alleging only that "[t]he actions of the Defendants, as alleged above, constitute fraudulent or unfair business practices and unfair competition within the meaning of" 93A. [Id. ¶ 135]. To state a 93A claim, Plaintiffs, among other things, "must show that [D]efendants' actions: '[] fall within the penumbra of some common-law statutory, or other established concept of unfairness[.]'" Albright v. Morton, 321 F. Supp. 2d 130, 141 (D. Mass. 2004), aff'd sub nom. Amrak Prods., Inc. v. Morton, 410 F.3d 69 (1st Cir. 2005) (cleaned up) (quoting Serpa Corp. v.

---

[9] Although they did not do so for defamation, Plaintiffs include several conclusory allegations as to Defendants' knowledge in pleading their commercial disparagement claim, which once again do no more than parrot the elements of a commercial disparagement which, without more, are insufficient. See [Compl. ¶ 130 ("The Defendants negligently made false and disparaging statements concerning the Plaintiffs in which the Defendants alleged that Bryan violated an agreement with the Company and stole products from the Company."), ¶ 131 ("The Defendants made the false and disparaging statements with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.")].

McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999)). Plaintiffs' 93A claim appears to rest on the same conduct that underlies its failed antitrust and state tort law claims, and thus also fails to state a claim under 93A. See id. at 141–42 (dismissing 93A claim premised on alleged defamatory statements which failed to state a claim for defamation); see also Advanced Tech. Corp. v. Instron, Inc., 925 F. Supp. 2d 170, 183 (D. Mass. 2013) (dismissing 93A claim premised on alleged anticompetitive behavior which failed to state a claim for antitrust); see also Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) (same, but breach of contract and negligence allegations).[10] Accordingly, Defendants' motion to dismiss Count V is **GRANTED**.

**6. Injunctive Relief (Count VI)**

Plaintiffs also bring a claim for "injunctive relief." [Compl. ¶¶ 138–40 (Count VI)]. Injunctive relief, however, "is not a stand-alone cause of action under Massachusetts or federal law." O'Brien v. Wilmington Tr. Nat'l Ass'n as Tr. to CitiBank, N.A., 506 F. Supp. 3d 82, 92 (D. Mass. 2020) (quoting Comley v. Town of Rowley, 296 F. Supp. 3d 327, 332 (D. Mass. 2017)). Instead, "courts applying Massachusetts law have regularly dismissed stand-alone counts for injunctive relief because they state a claim for a remedy, not a cause of action and add nothing to the complaint where injunctive relief is specified in the prayers for relief section of the complaint." Id. (cleaned up); see also Unitrode Corp. v. Linear Tech. Corp., No. 985983, 2000

---

[10] To the extent Plaintiffs intend to base their 93A claim on the Company's alleged forgery of the Agreement, these claims sound in fraud and would need to be pled with particularity under Rule 9(b), which, as discussed supra, they are not. Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 21–22 (1st Cir. 2017) ("Rule 9(b)'s requirements apply to both general claims of fraud and also to associated claims, such as [Defendants'], where the core allegations effectively charge fraud.") (internal quotation omitted); see also Martin v. Mead Johnson Nutrition Co., No. CIV A 09-11609, 2010 WL 3928707, at *3 (D. Mass. Sept. 30, 2010) ("A claim under Chapter 93A that involves fraud is subject to the heightened pleading requirement.").

WL 281688, at *5 (Mass. Super. Ct. Feb. 17, 2000) (dismissing a stand-alone count for injunctive relief because it "states a claim for a remedy, not a cause of action" and adds nothing to the complaint where injunctive relief is specified in the "prayers for relief" section of the complaint). Here, Plaintiffs request injunctive relief in their prayer for relief, [Compl. at Prayer for Relief], and they concede in their opposition brief that "[w]hether the request for injunctive relief is made by way of a standalone 'count' or in the remedy section of the complaint is a difference with no distinction," [ECF No. 23 at 24]. As such, Defendants' motion to dismiss the standalone count for injunctive relief (Count VI) is **GRANTED**.

**7. Leave to Amend**

As an alternative to dismissal, Plaintiffs conditionally request leave to amend the Complaint. [ECF No. 23 at 26 ("If for any reason this Court believes that the Plaintiffs have not adequately plead any of their claims, it should grant them leave to amend.")]. The "grant or denial of an opportunity to amend is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962). Here, Plaintiffs have not provided the Court with a proposed amended complaint or any indication as to how they intend to cure the pleading defects, stating only that they "respectfully request that the Court give them leave to amend so that they may plead additional facts." [ECF No. 23 at 26]. See Barricello v. Wells Fargo Bank, N.A., No. 13–12795, 2016 WL 1244993, at *9 (D. Mass. Mar. 22, 2016) ("Ordinarily, a plaintiff's failure to explain the basis for amendment is a sufficient reason to deny leave to amend."). Although it appears that any effort to amend may be futile, the Court will nonetheless **GRANT** Plaintiffs leave to file an amended complaint to cure the various pleading deficiencies, particularly given that this would be their first amendment.

## IV. CONCLUSION

For the reasons set forth above, Defendants' special motion to dismiss pursuant to Massachusetts' anti-SLAPP statute is **DENIED**. Defendants' motion to dismiss for failure to state a claim is **GRANTED** with leave to amend within 21 days of this order.

**SO ORDERED.**

December 19, 2024

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE