## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRIDGETTE BRYAN and<br>SPIN-LEARNING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ASCEND LEARNING, LLC,<br>ASSESSMENT TECHNOLOGIES<br>INSTITUTE, L.L.C.,<br>SCOTT NOVORR, and<br>SANDRA MILLER,<br><br>Defendants. | Case No. 1:24-cv-10583-ADB |

## FIRST AMENDED COMPLAINT, REQUEST FOR INJUNCTIVE RELIEF, AND JURY DEMAND

## INTRODUCTION

1.    Plaintiffs, Bridgette Bryan and SPIN-Learning, LLC (together, the "Plaintiffs"), bring this action against the Defendants, Ascend Learning, LLC ("Ascend") and Assessment Technologies Institute, L.L.C. ("ATI"), Scott Novorr ("Novor"), Sandra Miller ("Miller" and together with Ascend, ATI, and Novorr, the "Defendants"), to obtain injunctive relief and recover losses suffered as a result of Defendants' violations of the Sherman Act, violations of the Massachusetts consumer protection statute (G.L. c.93A,§§2, 11), tortious interference with Plaintiffs' business relations, and defamation, among other claims, in connection with the Defendants' monopoly of the Nursing Exam Marketplace (defined below), Defendants' defamatory actions against the Plaintiffs within their shared professional community, Defendants' unfair and deceptive business practices, and the Defendants' consistent pattern of intentionally interfering with and seeking to permanently destroy Plaintiffs' business endeavors.

2.    By their own admission, Ascend Learning, LLC and Assessment Technologies Institute, L.L.C. (hereinafter, together, the "Company"), are leading providers in their fields of integrated software, assessments, learning content, among other solutions.

3.  Despite their prolific presence in the industry, or perhaps because of, the Defendants have engaged in a smear campaign against the Plaintiffs including SPIN which, since its formation, has had one (1) customer.

4.  The Defendants' bullying tactics have resulted in tortious and predatory interference with Plaintiffs' business and reputation.

5.  Plaintiffs also allege the predatory business practices of the Defendants constitute violations of U.S. antitrust law and seek a remedy, together with injunctive relief.

## THE PARTIES

6.  Plaintiff, BRIDGETTE BRYAN ("Ms. Bryan"), is an individual residing in Biloxi, Mississippi.

7.  Plaintiff, SPIN-LEARNING, LLC ("SPIN"), is a Mississippi limited liability company with a principal business address located in Biloxi, Mississippi.

8.  Defendant, ASCEND LEARNING, LLC ("Ascend"), is a Delaware limited liability company with a principal place of business located at 25 Mall Road, 6th Floor, Burlington, Massachusetts 01803.

9.  Defendant, ASSESSMENT TECHNOLOGIES INSTITUTE, L.L.C. ("ATI"), is a Delaware limited liability company and wholly owned subsidiary of Ascend having a principal place of business located at 11161 Overbrook Road, Leawood, Kansas 66211.

10. Upon information and reasonable belief, Defendant, SCOTT NOVORR ("Mr. Novorr"), is an individual residing at 8800 W 157th Street, Overland Park, Kansas.

11. Mr. Novorr was at all times material hereto employed as ATI's Regional Vice President of the Great Lakes region.

12. SANDRA MILLER ("Ms. Miller"), is an individual residing at 1401 El Rito Avenue, Glendale, California.

13. Ms. Miller was at all time material hereto employed as ATI's Vice President of Sales of the West region.

## JURISDICTION AND VENUE

14. Federal question jurisdiction is conferred upon this Court pursuant to "The Sherman Act", 15 U.S.C. § 1, *et seq*. and "The Clayton Act", 15 U.S.C. § 13, *et seq*.

15. Additionally, Section 1337 of the Judicial Code (28 U.S.C.) expressly confers original jurisdiction on the United States District Courts over any civil action "arising under an act

of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." Moreover, this Court has jurisdiction under Section 1331, which permits a federal court to exercise jurisdiction in cases involving "federal questions."

16.    This Court has personal jurisdiction over Defendants, Mr. Novorr and Ms. Miller, as they are employees of Ascend, which company is located in Massachusetts.

17.    This Court has jurisdiction to hear the state law claims herein under the Pendant Claims Doctrine.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTS COMMON TO ALL COUNTS

### *ATI's Dominance in the Nursing Exam Marketplace*

19.    Ascend is an online educational provider of integrated software, assessments, learning content and analytics solutions through which Ascend provides individuals with academic support in a variety of career fields and industries, including healthcare.

20.    ATI is a wholly owned subsidiary of Ascend. *See* **Exhibit A** (sample Copyright Infringement notice sent by Ascend on behalf of ATI).

21.    ATI provides products and services used exclusively by nursing programs throughout the United States of America to assist nursing students in mastering the curriculum, graduating from nursing school, passing the National Council Licensure Examination ("NCLEX"), and developing practical experience.

22.    To become licensed, nursing students must pass the NCLEX exam (the National Council Licensure Examination for the licensing of nurses in the United States). *See* Parkes Complaint, ¶2. However, "[s]tudents are not eligible to sit for the NCLEX unless and until their nursing program provides approval…" *See* ¶¶11-12, fn.1 of the Complaint filed by Defendant ATI in Assessment Technologies Institute LLC v. Cathy Parkes d/b/a Level Up RN, U.S. District Court for the District of Kansas, Civil Action No. 2:19-cv-02514 (the "Parkes Complaint").

23.    ATI acknowledges that its tests are relied on by nursing programs to make critically important decisions about each student's 'readiness' to take the NCLEX. Id. at ¶2. Nursing students must complete ATI's courses and score well on ATI's practice tests before a school will approve the student to take the NCLEX. Additionally, ATI's nursing school clients are licensed by boards of nursing, and those boards monitor each school's NCLEX pass rate. Id. at ¶14. "If NCLEX pass rates decline and too many of a school's graduated students fail the NCLEX, the nursing school could lose its license to operate." Id.

24.    In November of 2013, ATI claimed to service ***2,000 of the 3,300 nursing schools in the United States***. *See* **Exhibit A**.

25. Less than 6 years later in 2019, in its own legal filings, ATI claimed to be "a leading provider of copyright-protected educational resources and assessment materials ***used by close to 3,000 nursing schools nationwide***. (emphasis supplied). *See* Parkes Complaint, ¶1).

26. Perhaps recognizing the antitrust risk ATI faced, in a related civil action filed in 2022 by ATI, ATI claims it "provides services to approximately ***1,900 of the roughly 3,750 nursing schools in the United States***". (emphasis supplied). *See* par.19 of the Complaint and par.20 of the Amended Complaint filed by Defendants Ascend and ATI in <u>Ascend Learning, LLC and Assessment Technologies Institute, L.L.C. v. Bridgette Bryan and SPIN-Learning, LLC</u>, U.S. District Court for the District of MA, Civil Action No. 1:22-CV-11978 (the "Bryan Complaint").

27. ATI represents itself as "the number one provider in the nursing field of entrance examination services, comprehensive online test preparation services, as well as the top provider of related assessment, remediation and review services to nursing students in the United States" (the "Nursing Exam Marketplace"). *See* **Exhibit A**; *see also* Parkes Complaint, ¶10.

28. ATI also developed and administers the "Test of Essential Academic Skills" or "TEAS" test, a standardized exam that assesses a student's readiness for nursing and allied health programs. Some nursing schools require the TEAS test for admissions into the nursing program.

29. By developing the TEAS test, providing nursing education, evaluation and assessment services as well as NCLEX test preparation, ATI has positioned itself to completely dominate and control the Nursing Exam Marketplace from admission to licensure.

30. ATI has become so dominant that it is a gate-keeper—whose practice exams nursing students must succeed on before the nursing school will even permit the student to take the actual licensing exam: the NCLEX. Passing the ATI exam has become an impediment for so many nursing students that websites and entire businesses (e.g. "Pass the ATI" and "LevelUp RN" have sprung up to help nursing students pass the <u>ATI practice exams</u> so the student can be approved to take the NCLEX[1]. *See* Parkes Complaint, ¶¶43-64.

31. ATI's dominance in the Nursing Exam Marketplace is demonstrated by the fact that passing the practice tests of ATI, a private NCLEX test preparation service provider, has become a de-facto pre-requisite to taking the actual NCLEX nursing license exam in more than 3,000 nursing programs throughout the United States.

---

[1] Although ATI views "Pass the ATI" and "LevelUp RN" as copyright infringers, their existence and persistence nonetheless demonstrates the tremendous demand by nursing students looking for a way to get past the ATI 'gate-keepers' so the nursing student can take the 'real' NCLEX licensing exam. In <u>Parkes</u>, ATI even acknowledged that the intent of the Level Up RN business was intended to help students pass the ATI practice exams, which ATI unabashedly admits are used by the students' schools to assess the student's knowledge and readiness to take the NCLEX

32. In its legal filings, ATI has represented that "[t]housands of nursing schools contract with ATI for use of ATI Products and ATI Proctored Exams with their nursing students every year. These schools license the ATI Proctored Exams and Products directly from ATI, and nursing students can also purchase ATI Products directly from ATI." *See* Parkes Complaint.

33. ATI promotes its purportedly high customer retention rates to secure new business and in support of its legal claims for infringement against third parties, but such retention is achieved in part by its use of misrepresentations by sales representatives, contradictory contract language and, if a school seeks to terminate the contract, the threat of costly duplicative payments or breach of contract litigation.

34. ATI represents that its "customer satisfaction rates throughout all levels is extremely high as demonstrated by a 95%+ client retention annually" (see Parkes Complaint, ¶10) or "customer satisfaction rates throughout all levels is extremely high as demonstrated by a renewal rate in excess of 90%" (*see* **Exhibit A**).

35. ATI claims in its marketing materials: "With our help, students garner great results in high-stakes test preparation, with pass rates closer to 100% than any other education system in the market. It's *no surprise that we're the first choice for more nurse educators, universities and colleges nationwide*." (emphasis supplied). *See* < https://www.atitesting.com/about > last accessed January 16, 2025.

### The 'Sole Source' Game

36. A 2021 proposal from the nursing program for approval by the Board of Trustees of the Morton Community College to enter into a contract with ATI, acknowledged ATI's control and dominance in nursing education services:

> We will be using the TEAS test for admissions to the Nursing Program which is developed by ATI. By adopting ATI for the students for the whole program, there would be one product used from admissions, throughout the nursing program, and NCLEX review. This would help uniformity for both the college to track student success throughout the program, and help students to be familiar with the program and its use throughout the program.

37. Similarly, in numerous 'sole source procurement contract' proposals submitted to various state governments, ATI claims to be the "sole source" available for its suite of services in the Nursing Exam Marketplace.

38. A "sole source procurement contract" refers to a non-competitive contract for goods or services that are only available from one supplier. It is an exception to the normal competitive process for purchasing of goods and services by government agencies at the state and federal level. Sole source procurements must adhere to the standards set forth in

the applicable state or federal laws and regulations. See "Fact Sheet: Sole Source Justification" U.S. Department of Justice, Office of Justice Programs, < https://www.ojp.gov/sites/g/files/xyckuh241/files/media/document/Sole_Source_FactShe et_C.pdf > last accessed January 13, 2025.

39.    To qualify for a 'sole source' contract, one of the following three circumstances must generally apply:

    a.    The item/service is available only from one source.
    b.    The public exigency or emergency for the requirement will not permit a delay resulting from competitive solicitation.
    c.    Competition is determined inadequate after solicitation of a number of sources.

40.    In the last 6 years, ATI claimed to be the 'sole source' able to provide services in the Nursing Exam Marketplace in *at least* the following contract proposals:

    a.    State of Mississippi with regard to services ATI proposed to provide to the University of Mississippi,
    b.    State of Mississippi with regard to services to Alcorn State University School of Nursing,
    c.    U.S. Dept. of Defense, Uniformed Services University of the Health Sciences (USU),
    d.    State of Hawaii with regard to the University of Hawaii (sole source services identified: "Furnish and deliver educational assessment, review, and skills improvement resources 'Complete Partnership' for the Department of Nursing at the University of Hawaii Maui College");
    e.    State of Illinois with regard to the Joliet Junior College (sole source services identified: "[to] [p]rovide a comprehensive student learning assessment and review program for nursing students";
    f.    State of New Mexico with regard to Eastern New Mexico University Roswell Branch (sole source services identified: *See* **Exhibit C** (Section III, State of New Mexico Sole Source Request and Determination Form).

41.    ATI circumvents the more competitive public request-for-proposal ("RFP") and bidding processes by copyrighting its exam assessment and evaluation materials, then it labels its programs with some 'brand' name (e.g. "Comprehensive Assessment & Review Program" or "CARP") and represents that *only* ATI can provide those specific 'branded' and products and services. For example, one 'sole source' proposal provides:

    a.    "The entire bundle of ATI Complete Partnership resources is distributed exclusively by ATI. The ATI Complete Partnership bundle is not available for purchase through any other source and may only be procured directly from ATI. Currently, ATI Complete Partnership is the only bundles of resources like this available that, in addition to including standardized assessments, tutorials, simulation, a full suite of NCLEX preparation and faculty/department support and resources, also includes Program Manager and Consulting"

42.     However, the "ATI Complete Partnership" is merely the services ATI provides to the nursing program. The ATI Contract describes "Consulting" as a mostly vague and non-descript four day 'program', two days of which are typically dedicated to "implementation and training" on ATI's "Program Manager". The "ATI Program Manager" appears to consist of training on topics as basic as managing a school's accreditation or vague subjects like "Clinical Management". *See* **Exhibit B** (Section 1).

43.     Another 'sole source' proposal provides: "ATI is the only vendor that provides all of the services that are required by the nursing program in one bundle/package. Also with all of the services being provided by ATI, there is consistency throughout various elements of the program. All of the services required by the program and provided by ATI are related to program success, and are either directly or indirectly related to maintaining compliance with the accrediting body, ACEN."

44.     Upon information and reasonable belief, ATI contacts decision-makers at public schools, colleges and universities, actively promotes its 'suite' of services to them, and then assists them in navigating the 'sole source' process to ensure ATI is identified as the 'sole source' of that specific suite of 'brand named' services so as to circumvent the more competitive public RFP and bidding processes and box out competitors such as Plaintiff. As a result, ATI has generated millions of dollars in so-called 'sole source' contracts with public educational institutions.

### *How the ATI Contract Locks in Nursing Schools and Unfairly Limits Competition to Maintain its Market Dominance and "Sole Source" Status*

45.     As a condition of receipt of ATI's produces and services, each nursing school is required to sign a contract with ATI entitled the "ATI Complete Partnership Agreement" which incorporates the "ATI Complete Partnership Additional Terms and Conditions" (collectively, the "ATI Contract").

46.     A typical example of the ATI Contract is attached hereto at **Exhibit B**.

47.     Typically, the ATI Contract provides for a three (3) year term.

48.     An Associate Degree in Nursing (ADN) is a two-year program that prepares students to take the NCLEX-RN exam to become a registered nurse (RN).

49.     As written, the ATI Contract expires by its terms half-way through a two-year ADN program. As a result, if a nursing school desires to phase out ATI's services and switch to another provider upon expiration of the ATI Contract, it must do so half-way through a degree program.

50.     An un-numbered paragraph at the end of the Section 1(a) of the 'terms and conditions' incorporated into the ATI Contract provides, "Except for ATI's proctored Assessments, which are available during each applicable Nursing Program Class, and Nursing Program Resources listed above, *which are available **during** the License Term*, **Students will have**

*access to the above ATI Products procured hereunder until the period ending one year after the applicable Nursing Program Class graduation date*." (emphasis supplied).

51.    By the terms of the ATI Contract, nursing school administrators are led to believe that after expiration of the ATI Contract term, ATI will continue to provide access to its products and services (except proctored exams and some branded products) for one (1) year after the graduation date of any class of students that began using ATI's products and services during.

52.    However, section 2(c) of the ATI Contract provides "On the License End Date, or in the event of an earlier License termination under this Section 2, Nursing Program shall make no further use of the Product or Services and, in the event of a breach of this Section 2, ATI shall deactivate Nursing Program's access to the Products and Services licensed hereunder."

53.    At least one nursing school's administrators who sought to allow the ATI Contract to expire were faced with the very dilemma the ATI Contract appears intended to create: to lock nursing schools into indefinite renewals.

54.    The nursing school entered into an ATI Contract that expired by its terms in the month of June three years later. According to the ATI Contract, students entering their first year of a two-year program would begin their nursing program with access to ATI's products and services. Half-way through the second year of the term, the school became interested in a provider of certain nursing education services other than ATI. At that time, a second group of students were in their first year of a two-year program and had access to ATI's products and services under the terms of the ATI Contract. However, the ATI Contract expired by its terms one-year after the second group of students were scheduled to graduate. To avoid the third group of first year students beginning their two year program with ATI's products and services and then having to switch to another provider in their second year of the program, the nursing school understood it could switch those incoming students to another provider, while the first and (per Section 1(a) of the terms and conditions of the ATI Contract) the second group of students could graduate and continue to have access to ATI's products and services for one-year after graduation. However, the nursing school was informed that it was contractually *obligated* to pay to ATI the full per-student fees due for each student in the third group of first year students even though the school intended to allow the ATI Contract to expire in June just after completion of the third groups' first year of a two-year degree program. Additionally, inconsistent with Section 1(a) of the terms and conditions but consistent with Section 2(c) of the ATI Contract, it was suggested that the second group of first year students (who began their two-year program in the second year of the ATI Contract) would not get access to ATI's products and services for one-year after graduation if that time period occurred after the expiration date.

55.    ATI thus uses the ambiguous and contradictory language at Sections 2(c) of the ATI Contract and 1(a) of the terms and conditions, as well as the absence of clear terms that identify the consequences of expiration, to pressure decision-makers into agreeing to renew the ATI Contract indefinitely.

56.    Given that ATI itself acknowledges that it engages in highly aggressive legal tactics (*see* Parkes Complaint, fn.2) it can be reasonably inferred that such decision-makers are also informed that any breach of contract (perceived or actual) by the nursing school would result in costly civil lawsuits for breach of contract.

57.    Upon information and belief, the above-referenced nursing school's experience is demonstrative of the experience of many other schools that have sought to allow the ATI Contract to expire and obtain the services of ATI's competitors, such as the Plaintiff.

58.    At least one version of the ATI Contract also provides the nursing school with "Success Credits" equal to a percentage of the per student fees actually collected by ATI. Per the contract, "Success Credits" may only be used to purchase additional ATI products and services, are non-transferrable and are otherwise useless if the contract expires or the school earlier terminates the contract.

59.    "Success Credits" can only be used to purchase more products and services from ATI. As such, these "Success Credits" further entrench and embed ATI and its products and services into the nursing school.

60.    "Success Credits" are also used to as a 'loss leader' to bait schools with artificially lowered per-student fees in the early years of the ATI Contract term, after which the credits sunset and the per-student fees return to 'normal'.

| Nursing Program Classes | First Term | Second Term | Third Term | Fourth Term | Total Fee[1] |
|---|---|---|---|---|---|
| 1222 Success Credit Eligible per sch A | 625.00 PAID | 625.00 PAID | 625.00 PAID | 756.25 (August 2022) | 2631.25 |
| 0523 Success Credit Eligible per sch A | $625.00 PAID | $625.00 PAID | $756.25 (August 2022) | $756.25 (December 2022) | $2762.50 |
| 1223 Success Credit Eligible per sch A | $625.00 PAID | $756.25 (August 2022) | $756.25 (December 2022) | $756.25 (August 2023) | $2893.75 |
| 0524 and all subsequent Nursing Program Classes | $756.25 (August 2022) | $756.25 (December 2022) | $756.25 (August 2023) | $756.25 (December 2023) | $3025.00 |

61.    The "Success Credits" are worth granting because, by the time they sunset, the school is 'hooked'. As noted above, the school is effectively locked-in to indefinitely renewing the contract *or* risk paying ATI an entire year of per-student fees for a full class of first year students who will not use its products or services, while also paying fees to a new provider for those same students to use the services of a new provider. Meanwhile, the school risks that existing students will be cut-off mid-program from the preparation services they're already familiar with. That, in turn, risk a lower NCLEX pass rate from the year of students who are cut-off mid-year or in the year after graduation which, in turn, risks the entire nursing program's accreditation with the local licensing boards. This strategy is well calculated and intentional and has resulted in ATI's near complete dominance of almost 3,000 of the roughly 3,750 total nursing programs in the United States.

62.     After expiration of the initial contract term, when nursing schools are locked-in, ATI consistently increases its base per-student pricing (an increase often between 20% and 25%). *See e.g.* ¶60 above; see also **Exhibit C** (increasing pricing from $693.75 per student per semester to $868.75 per student per semester beginning in the Fall 2025 semester).

63.     Ultimately, students, including those at public colleges and universities and those receiving federal student aid, are paying for ATI's services through their tuition and other fees paid directly to ATI, but there is no indication that the students are provided any option to 'opt-out' or choose any service provider other than ATI.

64.     In the law school context, ATI's practices would be akin to a law school including bar preparation fees in their tuition, only permitting one specific provider of bar preparation services to access the school's students, and then conditioning the student's right to take the state bar exam on passing the practice tests administered only by that same provider of bar preparation services while providing some law schools yearly 'credits' that can only be used if that school continues to limit its students use of the same bar prep service.

65.     ATI's practices, procedures and contract terms cause each nursing school to become captive to the continued and perpetual use of ATI's products and services, while ATI uses the substantial financial benefits of its market dominance, in-house legal staff and outside counsel to threaten so-called 'infringers' of its purported copyrights and eliminate competitors like the Plaintiff.

66.     ATI's tactics explain how ATI went from servicing approximately 1,900 of 3,300 nursing schools in 2013 to close to roughly 3,000 of less than 3,750 nursing programs in the United States today.

67.     Under the guise of protecting its copyrighted materials, ATI employs outrageously aggressive and oppressive tactics. ATI acknowledges that it takes "swift and aggressive legal action in the form of cease and desist demands, DMCA take down notices, and, where necessary and appropriate, involvement of law enforcement." *See* Parkes Complaint, ¶29. ATI even involves the Federal Bureau of Investigation ("FBI") and other law enforcement agencies to investigate and pursue criminal charges against individuals it believes have 'infringed' on its copyrights. *See* Parkes Complaint, fn.2.[2]

### *Ms. Bryan's Employment With ATI And Subsequent Resignation*

68.     In or around June or July 2010, Ms. Bryan began working for the Company as a part-time contractor/nurse educator.

---

[2] Even though Parkes removed the purportedly infringing content, the mere fact that she was trying to help nursing students pass the ATI, NCLEX and HESI tests was sufficient for ATI to file a lawsuit against her. See Parkes Complaint, ¶¶66-67.

69.    Ms. Bryan was offered full-time employment with the Company as an LR Educator/NCLEX Specialist in the Research & Development Department, which full time employment began on or about January 2, 2011.

70.    The Company never required Ms. Bryan to sign any employment agreement, confidentiality agreement, non-compete agreement, and/or intellectual property agreement.

71.    Not long after becoming a full-time employee, Ms. Bryan was promoted to a management position within the Company.

72.    After her promotion, the Company did not require Ms. Bryan to sign any employment agreement, confidentiality agreement, non-compete agreement, and/or intellectual property agreement nor did Plaintiff sign any such agreements.

73.    In or around December 2018, Ms. Bryan was again promoted to Director of NCLEX Services with the Company.

74.    After her promotion to Director of NCLEX Services, the Company did not require Ms. Bryan to sign any employment agreement, confidentiality agreement, non-compete agreement, and/or intellectual property agreement nor did Plaintiff sign any such agreements.

75.    Ms. Bryan was employed by the Company, full-time, for approximately eleven and one-half (11.5) years.

76.    At all times while employed by the Company, Ms. Bryan had full and unfettered access to her Company personnel file.

77.    Ms. Bryan never observed any employment agreement, confidentiality agreement, non-compete agreement, and/or intellectual property agreement in her Company personnel file.

78.    Ms. Bryan resigned from the Company on May 2, 2022.

### *Post-Resignation And The Company's Forgery*

79.    The Company did not conduct any exit interview, provide any severance agreement or other agreement for Ms. Bryan to sign, and did not offer "garden leave" to her.

80.    On or about May 27, 2022, Ms. Bryan received a "cease and desist" letter from the Company's counsel demanding that Plaintiff cease and desist from any violations of a purported "Confidentiality, Inventions and Non-Solicitation Agreement" (the "May 2022 Letter").

81.    Ms. Bryan was shocked to receive the May 2022 Letter and perplexed by the reference in the letter to a Confidentiality, Inventions and Non-Solicitation Agreement, which was not included with the May 2022 Letter.

82. After receiving the May 2022 Letter, Ms. Bryan's Mississippi counsel contacted the Company's counsel and requested a copy of the referenced Confidentiality, Inventions and Non-Solicitation Agreement.

83. After many weeks of no response, the Company's counsel emailed a copy of the alleged Confidentiality, Inventions and Non-Solicitation Agreement (the "Agreement") to Plaintiff's Mississippi counsel.

84. The Agreement appears legible and clear except as to the signature page of the Agreement.

85. Ms. Bryan maintains that she never signed the Agreement.

86. At the time of Ms. Bryan's resignation from ATI, ATI staff personnel files, including Ms. Bryan's, were maintained in physical files at the old ATI offices in Stillwell, Kansas, near the Leawood office -- not at ATI's new offices in Massachusetts. When Ms. Bryan was hired, one person named "Rhonda" was responsible for maintaining the personnel files for ATI. In or about 2016, Ascend and/or ATI began the long process of 'digitizing' the personnel files by engaging outside contractors and in-house employees to slowly pull files and scan pages into the computer system called "Ultimate Software".

87. When Ms. Bryan resigned, there was no copy of the "Agreement" in her digitized personnel file. When Ms. Bryan asked Colleen Swan, the Company's Payroll Manager, if there was any such Agreement in her personnel file, she informed Ms. Bryan that there was no such Agreement in Ms. Bryan's personnel file. As a result, the Company's HR staff were tasked with looking for Mr. Bryan's paper personnel file.

88. Either someone at the Company forged Ms. Bryan's signature on the Agreement after her resignation from the Company on May 2, 2022 or PDF editing software was used to transfer Ms. Bryan's signature from onto the Agreement from another document, and subsequently placed the forged or altered document into Ms. Bryan's Company digital personnel file.

89. Ms. Bryan was informed that employees in the Company's Human Resources Department were reprimanded because they were unable to locate any Agreement for Ms. Bryan.

90. Upon information and reasonable belief, the Company forged the Agreement in an effort to suppress Ms. Bryan's new business venture and business relationships.

### *SPIN-Learning, LLC*

91. Ms. Bryan formed SPIN to carry out her passions as she was nearing the end of her tenure with ATI.

92. On January 22, 2022, Ms. Bryan filed a Certificate of Formation to form SPIN as a Mississippi limited liability company.

93.   Following Ms. Bryan's resignation from ATI, she endeavored to funnel her experience, skillset, and passion for education into the development of SPIN within the framework of providing educational resources to students in all academic realms.

94.   SPIN offers academic coaching services, a telephone application (or "app") that offers daily service to students, a SPIN-Academy with engaging modules, and a faculty resource center, among other things.

95.   Ms. Bryan developed original content for SPIN with her small team of like-minded educators.

96.   SPIN employs one (1) part-time employee, Dianne Harris ("Ms. Harris").

97.   To date, SPIN has had only one institutional customer, Ivy Tech Community College in Indiana ("Ivy Tech"), which grossed SPIN the total amount of approximately $2,980.00.

98.   Approximately twice per year, SPIN hosts a "Lunch and Learn" seminar which is an educational offering that is free for nursing faculty. Consistently, SPIN will have over one-hundred (100) registrants for each offering.

99.   In or around October/November 2023, SPIN formed an advisory committee to assist in the formulation of a new SPIN product. The advisory committee consisted of Ms. Harris and approximately five (5) other persons who work within various nursing programs in schools across the country.

### *Bryan Complaint VS. Plaintiffs*

100.   On November 21, 2022, the Company filed a Complaint in this Court (and a First Amended Complaint on January 5, 2023), captioned <u>Ascend Learning, LLC and Assessment Technologies Institute, L.L.C. v. Bridgette Bryan and SPIN-Learning, LLC</u>, U.S. District Court for the District of MA, Civil Action No. 1:22-CV-11978 (the "Bryan Complaint").

101.   The Bryan Complaint made allegations against the Plaintiffs for alleged copyright infringement and breach of the alleged "Confidentiality, Inventions and Non-Solicitation Agreement", among other claims.

102.   While SPIN was dismissed by the Court from the Bryan Complaint, Ms. Bryan filed Counterclaims against the Company for Fraud, Forgery, and Civil Conspiracy.

103.   Upon information and reasonable belief, after the Company filed its Lawsuit against the Plaintiffs, the Company held a company-wide meeting informing its employees of the Lawsuit.

104.    Company employees were warned to have no contact with Bryan or SPIN, even for non-Company-related matters.

105.    On December 19, 2022, Ms. Harris, SPIN's sole part-time employee, received a "cease and desist" demand from the Company advising her of the Bryan Complaint and demanding she end violations of a purported non-solicitation/non-competition agreement – an agreement which Ms. Harris stated in her deposition on January 5, 2024 she had no recollection.

106.    Then, on January 13, 2023, counsel for the Company mailed Ms. Harris a copy of the Company's Amended Complaint.

107.    On or about December 11, 2023, the Company sent multiple "Keeper of the Records" subpoenas to schools to which the Company believed SPIN was marketing. The subpoenas sought all communications and/or documents by and between the school and SPIN and/or Bridgette Bryan and/or anyone with an @spin-learning.com email address.

108.    On March 1, 2024, the Company took the deposition of Alana Powers ("Ms. Powers").

109.    For approximately five (5) months in 2022, Ms. Powers had volunteered her sales experience to SPIN to help it develop a customer base.

110.    During Ms. Powers' deposition, she testified that she was a former ATI employee who, when she left ATI in or around January 2020, was sent a "cease and desist" demand letter warning her to refrain from contacting any employees of the Company.

### *Defendants' Tortious Actions Against The Plaintiffs And Interference With SPIN's Business*

111.    After the Bryan Complaint was filed, ATI shared details of the Lawsuit with its regional Vice Presidents and instructed them to advise ATI customers and/or prospective customers of SPIN that the Plaintiffs stole ATI products and to refrain from contact with SPIN or its workers.

112.    The Company launched a 'smear' campaign against the Plaintiffs to stifle SPIN's business.

113.    From November 23, 2023, to November 28, 2023, there was a sudden spike in Google searches for SPIN. The unprecedented uptick in Google searches coincides with the period in which the Company's 'vice presidents' and their subordinates were directed to inform educational institutions of the pending lawsuit and accusations against Bryan and SPIN.

114.    The accusations spread by the Company's representatives included that Ms. Bryan was a prior employee of the Company who had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning.

115.    Almost immediately after the smear campaign began in November 2023, virtually all of SPIN's prospective nursing school customers declined to further consider SPIN's products and services.

116.    One of SPIN's first products offered in mid-2022, after Ms. Bryan left ATI, addressed "freshman retention" in order to assist nursing programs (and other academic areas) maintain their students past their freshman year. During Ms. Bryan's development of SPIN's freshman retention product, she inadvertently emailed a PowerPoint presentation on it to her old ATI email account.

117.    At that time, the Company did not have a freshman retention program available to its customers.

118.    Yet, in August 2023, the Company suddenly had a freshman retention product which they apparently began putting together in 2022 around the time that SPIN had launched its freshman retention program.

119.    According to ATI's website, "…**in a 2022 ATI survey** of nurse educators, 71% reported significant academic struggles among first-year students, and 46% reported increased rates of first-year attrition." See https://www.atitesting.com/educator/blog/knowledge/2023/08/03/reducing-attrition-in-first-year-nursing-students (last accessed March 6, 2024) (emphasis added).

120.    Clearly the Company has been monitoring SPIN's progress and copied one of SPIN's products as its own.

121.    During the pendency of the Bryan Complaint, there have been multiple instances where the Company has purposefully and intentionally sought to harm both Plaintiffs' reputations in the industry and to outright sever Plaintiffs' business relationships.

122.    On multiple occasions, Mr. Novorr and Ms. Miller have sent emails and/or made phone calls to prospective SPIN customers to advise the schools of the pending Bryan Complaint and to spread the false claim that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning and that continued association with Plaintiffs could create additional costly legal problems for those schools including, but not limited to, a subpoena of all communications, documents and other information exchanged with SPIN personnel.

123.    For example, Mr. Novorr admitted to the Director of the nursing program at Bethel University in Minnesota, Delecia Parker ("Ms. Parker"), that he reached out to multiple schools and a "number of programs" to inform them of the pending Bryan Complaint and spread the false claim that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning.

124. Further, Mr. Novorr informed Ms. Parker in a telephone call that Ms. Bryan violated her non-compete agreement with ATI and misused ATI's proprietary information to develop SPIN and SPIN's products and services. Mr. Novorr further advised Ms. Parker that ATI would be sending subpoenas to any schools which ATI believed SPIN was marketing or otherwise doing business with.

125. Notably, the Company sent subpoenas to schools well outside of any geographic area that Bryan had any involvement in while working at ATI.

126. The Company's objective, as carried out by Defendants Novorr and Miller, was and is to deter educational institutions from giving SPIN any business and has had the effect of chilling SPIN's business relations.

127. Ms. Parker even rebuffed Mr. Novorr's obvious attempt to ruin SPIN's business and told him that she is nonetheless allowed to look at products outside of ATI's offerings.

128. Ivy Tech falls within Mr. Novorr's geographical region in his position with ATI.

129. As a result of SPIN's working relationship with Ivy Tech in 2023, Ivy Tech invited SPIN to take part in its all-faculty/all-campus meeting in November 2023. At the meeting, Ivy Tech's Director of its nursing program connected SPIN with several key people within Ivy Tech's administration.

130. Following the all-campus meeting, Ivy Tech affirmed to SPIN that SPIN would be part of Ivy Tech's curriculum meeting which was to occur in or around March 2024.

131. However, without explanation, in late January 2024, SPIN was disinvited from the curriculum meeting.

132. Ivy Tech ended its relationship with SPIN because of Mr. Novorr and the Company's defamatory and derogatory comments and interference with SPIN and Ivy Tech's relationship.

133. Ms. Miller also informed prospective customers of SPIN that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning.

134. For example, in or around late 2023, a nursing test coordinator at Stanbridge University in Irvine, CA ("Stanbridge"), Kathryn Meglitsch-Tate ("Ms. Tate"), asked SPIN if it would be willing to speak to Stanbridge's faculty on a specific topic and also showed interest in a new SPIN product that, to Plaintiffs' knowledge, has no market competitors at this time.

135. Yet, without explanation, Stanbridge ceased communication with the Plaintiffs and is no longer showing interest in the newly developed SPIN product.

16

136.    Before Stanbridge ceased communication with Ms. Bryan, however, Ms. Tate informed Ms. Bryan that she had received a call from Ms. Miller advising her of the Bryan Complaint in which call Ms. Miller stated, "[d]on't you think it's odd [Bryan] left ATI and has a business with all these questions?"

137.    Ms. Miller also told Ms. Tate not to tell the Plaintiffs about her call.

138.    Additionally, SPIN was informed by Crystal Bennett, the Director of another nursing program at the University of West Florida ("UWF") that an "ATI representative" had informed them that the Company was suing Bryan because Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning

139.    Bennett informed the school's legal department of the call and, subsequently, UWF received a subpoena from the Company for information on all communications, documents, materials and information it had exchanged with SPIN personnel.

140.    Shortly thereafter, one of SPIN's advisory committee members, who works at UWF, abruptly terminated her affiliation with SPIN.

141.    SPIN's registrants for its *Lunch and Learn* seminars, which were once very popular, has dramatically declined. For February 2024, SPIN had less than half the typical number of registrants signed up for its *Lunch and Learn* seminar.

142.    SPIN personnel attended the OADN conference in September 2024 and managed a marketing booth at the conference. The Company also managed a booth at the conference. During the conference, while nursing program decision-makers circulated through the booths, a Company representative, Mark Abrahms, hovered over SPIN's booth. He stood with back to the booth seeming to intentionally block access to the materials on SPIN's table to passersby.

143.    Bryan was also informed that two of the Company's representatives at the OADN were openly discussing Bryan's alleged theft of confidential and proprietary documents and information and copyrighted materials from the Company.

144.    Defendants have spread defamatory information throughout prospective customers of SPIN in the Nursing Exam Marketplace – an marketplace which the Company has monopolized – and convinced academic programs and institutions not to patronize SPIN's business.

145.    Plaintiffs have suffered financial loss and irreparable harm to Plaintiffs' reputations in the industry.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE SHERMAN ACT AND CLAYTON ACT
### (Plaintiffs v. ATI and ASCEND (the "Company"))

146. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

147. The Company boasts that it services nearly 3,000 nursing schools in the United States (out of approximately 3,750 total).

148. At all relevant times, the Company possessed market power (i.e., "monopoly power") in the Nursing Exam Marketplace, including the exclusion of competitors from the Nursing Exam Marketplace.

149. The Company has purposefully sought to sabotage and otherwise disrupt SPIN's business relationships within the Nursing Exam Marketplace by spreading false claims that Bryan stole confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning. The advance and support those false claims, the Company altered and forged a legal document.

150. The Company has also acted to suppress innovative products and methods that would increase competition and benefit the Nursing Exam Marketplace.

151. Despite the Bryan Complaint being in its infancy and there being pending Counterclaims, the Company spread false information to others in the Nursing Exam Marketplace, along with other defamatory remarks and accusations.

152. The conduct of Defendants caused an anti-competitive effect on interstate commerce in violation of the antitrust laws of the United States.

153. Defendants' conduct constitutes predatory practices for the purpose of restraining and attempting to restrain trade and competition in violation of the antitrust laws of the United States.

154. Defendants' conduct also constitutes predatory abuse of government process, specifically filing sham litigation in the judicial system for the purpose of placing Plaintiffs in further economic distress and to compel them to succumb to the unlawful demands of the Company.

155. While simultaneously spreading false accusations about Plaintiffs to their prospective customers in the Nursing Exam Marketplace, Defendants implemented an unlawful and deceptive scheme to entice nursing programs into engaging ATI with artificially and temporarily reduced per-student fees and provide them vague and deceptively written contracts that lock them into ATI's suite of products and services.

156.    Additionally, ATI falsely represented itself as the "sole source" of services to public education institutions within the Nursing Exam Marketplace so as to further solidify its market dominance.

157.    Defendants used the threat of having to incur the cost of responding to legal subpoenas, depositions and potential direct litigation for using SPIN's alleged 'stolen' products and services to defame and disparage Plaintiffs and dissuade potential customers in the Nursing Exam Marketplace from using SPIN's products and services.

158.    Upon information and reasonable belief, Defendants agreed not to serve subpoenas on, depose or file direct lawsuits against those nursing schools who denied considering SPIN's products or services and/or who agreed never to use SPIN's services in the future.

159.    The conduct of the Defendants constitutes an attempt to form a monopoly in direct violation of federal law.

160.    The substance of publicly available proposals for 'sole source procurement contracts' with ATI supports Plaintiffs allegations that ATI's unlawful conduct has given ATI a monopoly in the Nursing Exam Marketplace in violation of federal law.

161.    The claims made by or on behalf of Defendants in publicly available proposals for 'sole source procurement contracts' demonstrates that Defendants believe ATI is the only service provider able to service the Nursing Exam Marketplace.

162.    The conduct of the Defendants was oppressive and/or unconscionable, was in violation of the Sherman Act and Clayton Act, and was done with a malicious intent to injure its competitors like the Plaintiffs.

163.    As a result of the Defendants' conduct, SPIN was harmed through loss of income, added expenses, and diminished ability to compete in the Nursing Exam Marketplace.

## <u>COUNT II</u>
## <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS</u>
### (SPIN v. All Defendants)

164.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

165.    SPIN had a prospective business relationship with Ivy Tech, Stanbridge University, Bethel University, and the University of West Florida, among other schools.

166.    The Defendants knew about SPIN's prospective business relationships and for that reason specific targeted those educational institutions. Defendants' false and baseless claims caused at least Ivy Tech, Stanbridge University, Bethel University, and the University of West Florida not to enter into or continue the prospective relationship with SPIN.

167.    As set forth above in greater detail, the Defendants contacted an unknown number of schools to communicate unproven allegations against SPIN and Ms. Bryan in an effort to prevent SPIN from acquiring prospective relationships.

168.    The actions of Defendants as alleged above were done with oppression and malice constituting a tortious interference with SPIN's prospective economic advantage in the Nursing Exam Marketplace resulting in damages to SPIN.

169.    As a result of the Defendants' conduct, SPIN was harmed through loss of income, added expenses, and diminished ability to compete in the Nursing Exam Marketplace.

**COUNT III**
**DEFAMATION**
**(Plaintiffs v. All Defendants)**

170.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

171.    The Company intentionally and/or recklessly informed prospective customers of SPIN in the Nursing Exam Marketplace that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning

172.    On multiple occasions, Company representatives including, but not limited to, Mr. Novorr and Ms. Miller, have sent emails and/or made phone calls to prospective SPIN customers to advise the schools of the pending Bryan Complaint and to warn them that they would receive costly subpoenas and could be subject to direct litigation if they utilized SPIN's products and services after being informed, falsely, that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning

173.    Mr. Novorr admitted to a potential SPIN customer that he reached out to multiple schools and a "number of programs" to inform them of the pending Bryan Complaint and suggested that Bryan stole the Company's products.

174.    Further, Mr. Novorr informed Ms. Parker in a telephone call that Ms. Bryan violated her non-compete agreement with ATI and misused ATI's proprietary information to develop SPIN.

175.    Through their defamatory statements, as set forth in greater detail above, the Defendants have injured Plaintiffs' reputations in the Nursing Exam Marketplace.

176.    The Defendants knew, foresaw, and intended that their statements would be shared with prospective customers of SPIN.

177.   The Plaintiffs suffered irreparable damage to their reputations and esteem, as well as a loss of associations, and loss of potential business, as a result of the Defendants' conduct.

## COUNT IV
## COMMERCIAL DISPARAGEMENT
### (Plaintiffs v. All Defendants)

178.   Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

179.   Representatives of the Company, acting on behalf of and in furtherance of ATI's business and to maintain ATI's dominance in the Nursing Exam Marketplace, negligently made false and disparaging statements concerning the Plaintiffs in which they alleged that Bryan had stolen confidential and proprietary documents and information and copyrighted materials from the Company, and that she was using those materials in her new, competing business, SPIN Learning.

180.   Representatives of the Company, acting on behalf of and in furtherance of ATI's business and to maintain ATI's dominance in the Nursing Exam Marketplace, made the false and disparaging statements with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

181.   Representatives of the Company, acting on behalf of and in furtherance of ATI's business and to maintain ATI's dominance in the Nursing Exam Marketplace, intended to cause pecuniary harm to Plaintiffs' interests or knew that   pecuniary harm was a foreseeable result of the disparaging statements.

182.   Defendants are liable to Plaintiffs for the damages they have suffered, and continue to suffer, as a result of the defamatory statements in an amount to be determined at trial, together with interest and costs including reasonable attorneys' fees.

## COUNT V
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF
## M.G.L. c. 93A, §§ 2 and 11
### (SPIN v. ATI and ASCEND (the "Company"))

183.   Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

184.   The actions of the Defendants, as alleged above, constitute fraudulent or unfair business practices and unfair competition within the meaning of Massachusetts General Law Chapter 93A, § 11.

185.   The conduct of the Company, as set forth in this Complaint, was oppressive and/or unconscionable, violated M.G.L. c. 93A, §§ 2 and 11, and the regulations promulgated thereunder, and was knowing and willful.

186.    As a direct and proximate result of the Defendants' conduct, SPIN was harmed through loss of income, added expenses, and diminished ability to compete in the Nursing Exam Marketplace, which damages shall be trebled in accordance with Massachusetts General Law Chapter 93A, § 11 and awarded to SPIN.

## COUNT VI
## INJUNCTIVE RELIEF
### (Plaintiffs v. All Defendants)

187.    Plaintiffs repeat and re-allege each and every allegation contained in the Complaint and incorporate them into this count as if expressly realleged herein.

188.    As a result of Defendants' acts and/or omissions, Plaintiffs have sustained, and will continue to sustain, irreparable injury including, but not limited to, damage to their reputations, lost profits, and loss of business contacts.

189.    Plaintiffs are entitled to a preliminary and permanent injunctive relief enjoining Defendants from making the false, misleading and/or deceptive statements, as alleged above, regarding the Plaintiffs' personally and in a business context.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs, Bridgette Bryan and SPIN-Learning, LLC, respectfully pray that

this Honorable Court:

A.    Enter judgment in favor of the Plaintiffs on all counts of this Complaint;

B.    Grant preliminary and permanent injunctive relief enjoining Defendants from making the false, misleading and/or deceptive statements, as alleged above, regarding the Plaintiffs' personally and in a business context;

C.    Order the Defendants to retract all misleading and/or deceptive statements of fact alleged above;

D.    Award Plaintiffs compensatory, expectation, punitive, multiple, and exemplary damages in an amount to be determined at trial;

E.    Award the Plaintiff reasonable costs, expenses, interest and attorney's fees in an amount to be determined at trial;

F.    Award Plaintiff multiple damages and reasonable attorneys' fees, expenditures and court costs pursuant to M.G.L. c. 93A or as otherwise available at law; and,

G.    Grant such other relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, Bridgette Bryan and SPIN-Learning, LLC, hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**Plaintiffs,**
**BRIDGETTE BRYAN and SPIN-LEARNING, LLC**

By their attorney,

*/s/ Travis J. Jacobs_____*
Travis J. Jacobs, Esq. (MA BBO# 691721)
THE JACOBS LAW LLC
1359 Hancock Street, Suite 10
Quincy, MA 02169
(800) 652-4783 (p) / (888) 613-1919 (f)
TJacobs@TheJacobsLaw.com

DATED: January 16, 2025