UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BRIDGETTE BRYAN and<br>SPIN-LEARNING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ASCEND LEARNING, LLC,<br>ASSESSMENT TECHNOLOGIES<br>INSTITUTE, L.L.C., SCOTT NOVORR,<br>AND SANDRA MILLER,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 24-cv-10583-ADB |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

      Bridgette Bryan ("Bryan") and SPIN-Learning, LLC ("SPIN") (together, "Plaintiffs")

bring this action against Bryan's former employer, Ascend Learning, LLC ("Ascend"), and its

subsidiary, Assessment Technologies Institute, L.L.C. ("ATI," and, together with Ascend, the

"Company"), as well as two individuals employed by ATI, Scott Novorr ("Novorr"), and Sandra

Miller ("Miller") (collectively with the Company, "Defendants").  In their Amended Complaint,

Plaintiffs once again allege federal antitrust violations (Count I), various state tort violations

(Counts II–IV), and violations of Massachusetts General Laws Chapter 93A ("93A") (Count V).

[ECF No. 38 ("Amended Complaint" or "Am. Compl.")].  Currently pending before the Court is

Defendants' motion to dismiss for failure to state a claim.  [ECF No. 45].  For the reasons set

forth below, Defendants' motion is **<u>GRANTED</u>** with prejudice.

# I.    BACKGROUND

## A.    Factual Background

The Court writes for the parties and assumes the reader's familiarity with the facts of this action, which it set out in detail in the Court's order on Defendants' motion to dismiss Plaintiffs' original complaint.  [ECF No. 35].  The Court discusses new facts in the following analysis as needed.  Those relevant facts are taken from the well-pleaded allegations in Plaintiffs' Amended Complaint, which the Court, as it must, assumes to be true.  Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024).  The Court draws all reasonable inferences in Plaintiffs' favor when considering a motion to dismiss.  Id.

## B.    Procedural History

Plaintiffs filed their initial complaint in this action on March 7, 2024.  [ECF No. 1 ("Compl.")].  Defendants moved to dismiss on May 8, 2024, [ECF No. 17], for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Massachusetts anti-SLAPP statute based on Defendants' assertion that Plaintiffs filed suit in retaliation for Defendants' filing of a related lawsuit, Ascend Learning, LLC v. Bryan, Case No. 22-cv-11978 (D. Mass. filed Nov. 21, 2022) (the "Company Lawsuit").  Once the motion was fully briefed, the Court denied Defendants' motion to dismiss pursuant to the Massachusetts anti-SLAPP statute but granted the motion based on Plaintiffs' failure to state a claim, and afforded Plaintiffs leave to amend.  [ECF No. 35 ("First Motion to Dismiss Order")].  Plaintiffs filed the operative Amended Complaint on January 17, 2025, [Am. Compl.], Defendants once again moved to dismiss for failure to state a claim on February 14, 2025, [ECF No. 45], Plaintiffs opposed on April 4, 2025, [ECF No. 56], Defendants filed a further reply in support of their motion on May 9, 2025, [ECF No. 57], and Plaintiffs filed a sur-reply on May 30, 2025, [ECF No. 60].

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard requires "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Cardigan Mountain Sch., 787 F.3d at 84 (citation modified). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (citation modified). In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

## III.    DISCUSSION

### A.    Antitrust Violations (Count I)

Plaintiffs bring one claim for violations of the Sherman Act and Clayton Act, [Am. Compl. ¶¶ 146–63 (Count I)]. As was true of their original complaint, Plaintiffs' Amended

Complaint fails to specify which statutory provisions Defendants allegedly violated, see [id.]; [ECF No. 35 at 12], but Plaintiffs clarify in their opposition that their claim is for purported violations of § 2 of the Sherman Act, 15 U.S.C. § 2, [ECF No. 56 at 10]. Even so, § 2 of the Sherman Act itself contains multiple theories of liability, as it makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States," 15 U.S.C. § 2, and Plaintiffs do not specifically indicate whether their claim is one for monopolization, attempted monopolization, or conspiracy to monopolize, [ECF No. 56 at 10–11]. Because Plaintiffs repeatedly plead that the Company already possesses a monopoly, see, e.g., [Am. Compl. ¶¶ 1, 144, 148, 160], and because much of their briefing focuses on the elements of a monopolization claim, [ECF No. 56 at 12–25], the Court will treat the claim as one for monopolization, rather than for attempted monopolization or conspiracy to monopolize.[1]

To prove monopolization, a plaintiff must show "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st

---

[1] Plaintiffs do include one allegation in their Amended Complaint that Defendants' conduct "constitutes an attempt to form a monopoly in direct violation of federal law." [Am. Compl. ¶ 159 (emphasis added)]. To the extent Plaintiffs did intend to bring an attempted monopolization claim, this claim fails for the same reasons articulated herein—namely, that Plaintiffs have failed to adequately plead Defendants' power in a well-defined product market and therefore have not pleaded that Defendants have or had "a dangerous probability of achieving monopoly power." Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013); see also LLM Bar Exam, LLC v. Barbri, Inc., 271 F. Supp. 3d 547, 585 (S.D.N.Y. 2017) ("LBE's failure to define a valid market prevents it from demonstrating that Barbri has a dangerous probability of achieving a monopoly."), aff'd, 922 F.3d 136 (2d Cir. 2019).

Cir. 2013) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)).  Monopoly

power is "the power to control prices or exclude competition."  United States v. E.I. du Pont de

Nemours & Co., 351 U.S. 377, 391 (1956).  "Absent direct proof of supracompetitive prices,

monopoly power is typically proven by defining a relevant market and showing that the

defendant has a dominant share of that market."  Diaz, 716 F.3d at 265; see also Coastal Fuels of

P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196–97 (1st Cir. 1996) (distinguishing

between "direct evidence of market power" and "circumstantial evidence of market power," such

as evidence "showing that the defendant has a dominant share in a well-defined relevant market

and that there are significant barriers to entry in that market and that existing competitors lack

the capacity to increase their output in the short run").

    In the First Motion to Dismiss Order, the Court dismissed Plaintiffs' § 2 claim on the

grounds that Plaintiffs had failed to define the relevant market.  [ECF No. 35 at 14–15].

Specifically, "Plaintiffs ha[d] defined the relevant market as nursing schools in the United States

that use the Company's products," which was "at best, circular, defining the market which

Defendants [were] alleged to [have] monopolize[d] as consisting of schools which use

Defendants' products and services."  [Id. at 14].  Moreover, Plaintiffs had not pleaded sufficient

facts "regarding the geographic boundaries of the market (other than 'the United States'), market

trends, other products within the market, or facts that would otherwise establish Defendants'

market dominance for the purposes of a § 2 claim."  [Id. at 15].

    Plaintiffs contend that their Amended Complaint cures this defect because it "clearly

define[s] the 'Nursing Exam Marketplace' as the relevant market and establish[es] its geographic

scope at ¶ 27 of the [Amended Complaint]."  [ECF No. 56 at 12].  Paragraph 27 of the Amended

Complaint, in turn, defines the "Nursing Exam Marketplace" by reference to a description

Defendants provided of ATI's services in a copyright infringement notice and to a complaint in an unrelated copyright infringement litigation.  [Am. Compl. ¶ 27 (citing Assessment Techs. Inst., LLC v. Cathy Parkes d/b/a Level UP RN, No. 19-cv-02514, 2020 WL 508922 (D. Kan. 2019), ECF No. 1 ("Parkes Complaint"))]; see also [ECF No. 38-1 at 2 (infringement notice)]. Specifically, ATI described itself in the infringement notice as "the number one provider in the nursing field of entrance examination services, comprehensive online test preparation services, as well as the top provider of related assessment, remediation and review services to nursing students in the United States," which Plaintiffs adopt as their definition of the "Nursing Exam Marketplace" for purposes of this antitrust claim, [Am. Compl. ¶ 27].

Defendants counter that, by relying on the description that ATI provided of its own services in the Parkes Complaint to define the Nursing Exam Marketplace, Plaintiffs have once again "artificially defined [the market] to describe the products and services Defendants [specifically, ATI and Ascend] provide—not the relevant market." [ECF No. 57 at 4 (footnote omitted)]. Defendants further contend that Plaintiffs have failed to plead sufficient facts to define the market because their purported "market definition" "consists of a vague list of products and services . . . . [which] Plaintiffs do not even allege . . . are reasonably interchangeable substitutes for each other, nor could they, as they each perform a different function." [ECF No. 46 at 14]. Finally, Defendants assert that Plaintiffs have failed to plead sufficient, non-conclusory factual allegations that Defendants possess monopoly power within what Defendants contend is an ill-defined market.  [Id. at 14–15].[2]

---

[2] Defendants also contend that Plaintiffs' § 2 claim fails because they have not sufficiently pleaded that Defendants engaged in anticompetitive conduct or that Plaintiffs suffered antitrust injury.  [ECF No. 46 at 15–21].  Because it finds that Plaintiffs have failed to plead that

The Court recognizes that dismissal on the grounds of failing to plead market definition is rare, as Plaintiffs need only "plausibly delineate a relevant market." Vazquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286, 297 (1st Cir. 2022). That said, "there is no absolute rule against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way," Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 53 (2d Cir. 2016), which Plaintiffs have failed to do here for a number of reasons. First, by lifting Defendants' description of ATI's services and products from the infringement notice (and the substantially similar description in the Parkes Complaint) to define the "Nursing Exam Marketplace," Plaintiffs have once again created an artificial and inherently circular definition of the relevant market, in essence alleging that Defendants monopolize sales of their own products. This alone strikes the Court as sufficient for dismissal. Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc., 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (complaint which "defined the relevant market solely as the market for" competitor's brand of health education materials was inadequate where it also failed "to allege facts regarding substitute products, to distinguish

---

Defendants exercise monopoly power in a well-defined market, the Court need not reach these issues. That said, the Court is skeptical that Plaintiffs have sufficiently pleaded anticompetitive conduct, as much of the underlying conduct is insufficient to state an antitrust claim as a matter of law. For instance, Plaintiffs focus much of their Amended Complaint on Defendants' competing for and winning sole-source contracts with public colleges and universities, despite the fact that courts have repeatedly found that "sole-source contracts with government entities are not anticompetitive for the purposes of Sherman Act claims." ACT, Inc. v. Worldwide Interactive Network, No. 18-cv-00186, 2020 WL 12574235, at *10 (E.D. Tenn. Mar. 24, 2020) (collecting cases). Similarly, Plaintiffs make a mealy-mouthed argument that Defendants' related lawsuit against Plaintiffs (referring to the "Company Lawsuit," discussed at length in this Court's ruling on Defendants' prior motion to dismiss) constitutes anticompetitive conduct because it is a "sham," see e.g., [ECF No. 56 at 21–22], which rings hollow in light of this Court's ruling granting summary judgment for Ascend and ATI on many counts in that action. [Company Lawsuit at ECF No. 174]; see also Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 n.5 (1993) ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

7

among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand").

Second, even if the Court were to assume that Plaintiffs, despite lifting their market definition from the Parkes Complaint, intended the Nursing Exam Marketplace to encompass products and services other than ATI's, the problem remains that Plaintiffs have, again, made no attempt to plead the parameters of the relevant market in accordance with the principles of reasonable interchangeability and cross-elasticity of demand.  LLM Bar Exam, LLC v. Barbri, Inc., 271 F. Supp. 3d 547, 583–84 (S.D.N.Y. 2017) (rejecting definition of "LLM Market" for purposes of bar exam preparation materials where plaintiff had "not defined [it] 'with reference to the rule of reasonable interchangeability and cross-elasticity of demand,' a deficiency that alone merits dismissal of [plaintiff's] Section 2 claim" (quoting Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008)), aff'd, 922 F.3d 136 (2d Cir. 2019).  Indeed, after parsing the Amended Complaint and Plaintiffs' briefing, it remains unclear to the Court which products Plaintiffs contend fall within their market definition.  For example, in their opposition, Plaintiffs repeatedly contend that the market is limited to test preparation services specifically aimed at the National Council Licensure Examination ("NCLEX") and other "nursing examinations."  [ECF No. 56 at 13–14 (discussing Defendants' purported dominance in NCLEX marketplace); id. at 16 (arguing "there are few, if any, other nursing exam preparation products")]; see also [ECF No. 60 at 4 (arguing in sur-reply that "Nursing Exam Marketplace" does not include services "not related to nursing school examination or preparations")].  In actuality, the definition of "Nursing Exam Marketplace" in the Amended Complaint is far broader than exam preparation materials, as it purports to encompass, among other things, SPIN's "freshman retention program," which is intended to help "nursing programs (and other

academic areas) maintain their students past their freshman year." <u>See</u> [Am. Compl. ¶¶ 27, 116]. In other words, the "Nursing Exam Marketplace," as defined, appears to encompass any service Defendants provide that touches a nursing school, without regard for the underlying product.

Third, as a consequence of the Amended Complaint at best tenuously pleading the relevant product market, the Court agrees with Defendants that "Plaintiffs also have not pled facts sufficient to establish that the Company had market power." [ECF No. 46 at 14]; <u>see also</u> <u>Concord Assocs.</u>, 817 F.3d at 53 ("[W]ithout a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." (quoting <u>Xerox Corp. v. Media</u> <u>Sciences Int'l, Inc.</u>, 511 F. Supp. 2d 372, 383 (S.D.N.Y.2007)). Plaintiffs' argument as to market power rests primarily on Defendants' purported market share.[3] [ECF No. 56 at 13]. At most, Plaintiffs allege that Defendants provides services to the majority of nursing schools in the United States. <u>See, e.g.</u>, [Am. Compl. ¶ 61 (alleging anticompetitive behavior "has resulted in ATI's near complete dominance of almost 3,000 of the roughly 3,750 total nursing programs in the United States"); <u>id.</u> ¶ 66 ("ATI's tactics explain how ATI went from servicing approximately 1,900 of 3,300 nursing schools in 2013 to close to roughly 3,000 of less than 3,750 nursing programs in the United States today.")]. In the absence of a well-defined product market, however, the allegation that Defendants "provide services" fails to plausibly allege monopoly

---

[3] Although not entirely clear, Plaintiffs also seem to argue that the Amended Complaint sufficiently pleads market power because nursing schools sometimes condition a student's ability to sit for nursing licensure exams on the student performing well on Defendants' preparation materials. [ECF No. 56 at 14–15]. Even if this were enough, and the Court is at best skeptical, Plaintiffs fail to plead sufficient facts to indicate that this preference among schools was a result of anticompetitive conduct, rather than "as a consequence of a superior product [or] business acumen." <u>Diaz</u>, 716 F.3d at 265 (quoting <u>Grinnell</u>, 384 U.S. at 570–71).

9

power because it is completely silent on which, if any, "services" provided comport with Plaintiffs' market definition and which, if any, competitors are in the market for those services.

Because Plaintiffs fail to plead that Defendants exercise monopoly power in a well-defined product market, Defendants' motion to dismiss Count I is **<u>GRANTED</u>**.

## B. Tortious Interference (Count II)

Plaintiffs again claim tortious interference with prospective business relations. [Am. Compl. ¶¶ 164–69 (Count II)]. In particular, Plaintiffs allege that Defendants acted with "oppression and malice" to cause at least four nursing schools to end their prospective relationships with Plaintiffs by "communicat[ing] unproven allegations against SPIN and Ms. Bryan" to several nursing schools with whom Plaintiffs had prospective business relationships. [Id. ¶¶ 165–68].

To bring a tortious interference with a business relationship claim under Massachusetts law, Plaintiffs must show that they (1) "had an advantageous relationship with a third party . . . ; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship . . . was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Hamann v. Carpenter, 937 F.3d 86, 91, 93 (1st Cir. 2019) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)). The alleged improper conduct element requires something more than interference, inVentiv Health Consulting, Inc. v. Equitas Life Scis., 289 F. Supp. 3d 272, 283 (D. Mass 2017), including, for example, "[v]iolation of 'a statute or a rule of common law' or use of threats, misrepresentations of facts or 'other improper means,'" id. (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990)).

10

In the First Motion to Dismiss Order, the Court dismissed Plaintiffs' tortious interference claim for failure to sufficiently allege improper motive or means. [ECF No. 35 at 16–17]. Specifically, the Court held that, "[r]egarding motive, Plaintiffs offer[ed] only conclusory allegations parroting the elements of their tortious interference claim," and that "[w]ithout more" these "conclusory allegations [were] insufficient." [ECF No. 35 at 17]. As the Amended Complaint merely repeats the same conclusory statements about Defendants' motive, see, e.g., [Am. Compl. ¶¶ 112, 168], the Court reiterates its prior holding and moves on to Plaintiffs' amended allegations regarding improper means.

On that front, the Court previously rejected Plaintiffs' claim that Defendants engaged in improper conduct when they called Plaintiffs' prospective clients (who were Defendants' present clients) to inform them about the pending Company Lawsuit and its underlying allegations. [ECF No. 35 at 17]. On this go-around, Plaintiffs again hang their hat on Defendants' communications with clients about the Company Lawsuit, contending that the Amended Complaint establishes that Defendants engaged in improper conduct when they "threaten[ed] those clients] with subpoenas if they continued to associate with Plaintiffs." [ECF No. 56 at 26]. In actuality, the Amended Complaint pleads only that Novorr and Miller informed several schools that "continued association with Plaintiffs could create additional costly legal problems for those schools," including a subpoena of communications with SPIN personnel. [Am. Compl. ¶ 122]. Even construing this allegation generously, the Court is unclear as to how it is materially distinguishable from those that the Court previously rejected as constituting improper conduct, and Plaintiffs provide no argument or authority for the proposition that informing clients about the possibility of a subpoena related to the Company Lawsuit constitutes a "threat," never mind improper means constituting tortious interference under Massachusetts law. Cf. Cook & Co. Ins.

11

Servs. v. Volunteer Firemen's Ins. Servs., 657 F. App'x 1, 2 (1st Cir. 2016) ("[C]ompetitive infighting, though sometimes unattractive, is not per se unlawful.").[4],[5]

Although not argued as a hook for improper means in their briefing, see [ECF Nos. 46 60], Plaintiffs once again allege in the Amended Complaint that, "in an effort to suppress [Bryan's] new business venture and business relationships," [Am. Compl. ¶ 90], the Company forged Bryan's signature on a "Confidentiality, Inventions, and Non-Solicitation Agreement" (the "Agreement"), [id. ¶ 88], see also [id. ¶¶ 79–90]. Out of an abundance of caution, the Court assumes that Plaintiffs intend to rely on this forgery as a basis for improper conduct and addresses Plaintiffs' allegations regarding it. In the First Motion to Dismiss Order, the Court held that Plaintiffs' forgery allegations, which were "pled 'upon information and reasonable belief' without any specificity as to the source of the information or reasons for the belief" did

---

[4] In a confusing gambit, Plaintiffs additionally argue that these statements were improper because they have no plausible nexus to a government proceeding. [ECF No. 56 at 26]. The Court is unclear as to the relevance of this argument, given that Plaintiffs' cited authority discusses protected petitioning activity for the purposes of anti-SLAPP laws, not improper conduct, [id. (citing Blanchard v. Steward Carney Hosp., Inc., 75 N.E.3d 21, 32 (Mass. 2017))], and this Court already rejected Defendants' motion to dismiss pursuant to the Massachusetts anti-SLAPP statute, [ECF No. 35 at 9–11].

[5] The Amended Complaint contains a new allegation regarding an incident when Mark Abrahms ("Abrahms"), a non-defendant Company representative, "hovered over SPIN's booth" at an "OADN conference" to "intentionally block" "nursing program decision-makers" from accessing SPIN's materials, [Am. Compl. ¶ 142]. Plaintiffs do not point to this alleged incident in their opposition brief, see [ECF No. 56], but, to the extent Plaintiffs intended to rely on this allegation as a basis for improper conduct, the Court is skeptical that this conduct, without more, rises to the level of "competitive infighting," never mind improper conduct. Cook & Co., 657 F. App'x at 2. Moreover, even if this were to constitute improper conduct, Plaintiffs have not alleged sufficient facts to demonstrate that this incident meets the other requirements for tortious interference with a business relationship. They do not allege, for example, that any schools with which SPIN had a prospective business relationship attended the conference or that Abrahms' actions caused the demise of any of Plaintiffs' prospective business relationships. See [Am. Compl.]; cf. Hamann, 937 F.3d at 91–93.

not meet the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b), as required to state a claim for tortious interference premised on fraudulent conduct.  [ECF No. 35 at 18 (citing N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 14 (1st Cir. 2009) and Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 275 (D. Mass. 1998))].  In their Amended Complaint, Plaintiffs largely recycle their well-trod[6] allegations regarding the alleged forgery, [Am. Compl. ¶¶ 79–90], adding, in essence, only two factual allegations:

- At the time of Ms. Bryan's resignation from ATI, ATI staff personnel files, including Ms. Bryan's, were maintained in physical files at the old ATI offices in Stillwell, Kansas, near the Leawood office -- not at ATI's new offices in Massachusetts. When Ms. Bryan was hired, one person named "Rhonda" was responsible for maintaining the personnel files for ATI. In or about 2016, Ascend and/or ATI began the long process of 'digitizing' the personnel files by engaging outside contractors and in-house employees to slowly pull files and scan pages into the computer system called "Ultimate Software".  [Am. Compl. ¶ 86].

- When Ms. Bryan resigned, there was no copy of the "Agreement" in her digitized personnel file. When Ms. Bryan asked Colleen Swan, the Company's Payroll Manager, if there was any such Agreement in her personnel file, she informed Ms. Bryan that there was no such Agreement in Ms. Bryan's personnel file. As a result, the Company's HR staff were tasked with looking for Mr. Bryan's paper personnel file.  [Am. Compl. ¶ 87]

These added allegations are insufficient to clear the Rule 9(b) hurdle.  While Rule 9(b) "does not demand a blow-by-blow account" or obligate Plaintiffs "to allege every conceivable detail incident to the fraud," it requires, at minimum, that Plaintiffs adequately "plead[] the who,

---

[6] Although not determinative for purposes of the present motion, the Court notes that this is the third time across two related lawsuits that Bryan has asked this Court to consider whether her signature on the Agreement was a product of fraud.  In particular, the Court has considered: (1) Bryan's counterclaim for fraud in the Company Lawsuit, [Company Lawsuit, ECF No. 40]; (2) Bryan's allegations that her signature was forged in the prior complaint in this action, [Compl. ¶¶ 34–43 (dismissed by [ECF No. 35 at 18])]; and (3) Bryan's argument in the Company Lawsuit that the forgery prevented the Company from obtaining summary judgment as to breach of the Agreement, [Company Lawsuit, ECF Nos. 165-2, 165-3].  All these arguments, including those made with the benefit of discovery into the Agreement, have been unsuccessful.

what, where, and when of the alleged fraudulent conduct." Foisie v. Worcester Polytechnic Inst.,
967 F.3d 27, 50 (1st Cir. 2020).  Rather than add any factual particularity regarding the claimed
forgery, Plaintiffs' added allegations once again plead around the fraudulent conduct, offering
only the speculative inference that the Agreement, which was at one point unavailable, became
available because unknown actors forged it by unknown methods at an unknown point in time.
[Am. Compl. ¶ 88 ("Either someone at the Company forged Ms. Bryan's signature on the
Agreement after her resignation from the Company on May 2, 2022 or PDF editing software was
used to transfer Ms. Bryan's signature from [sic] onto the Agreement from another document,
and subsequently placed the forged or altered document into Ms. Bryan's Company digital
personnel file.")].  This is insufficient.

Because Plaintiffs once again fail to plead improper motive or means, Defendants'
motion to dismiss Count II is **GRANTED**.

### C.    Defamation (Count III)

To state a claim for defamation under Massachusetts law, a plaintiff must allege: "(1) that
'[t]he defendant made a statement, concerning the plaintiff, to a third party'; (2) that the
statement was defamatory such that it 'could damage the plaintiff's reputation in the
community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he
statement either caused the plaintiff economic loss . . . or is actionable without proof of
economic loss.'" Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (alterations in original)
(quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510–11 (Mass. 2003)).  To meet the notice
pleading requirements of Federal Rule of Civil Procedure 8, Plaintiffs must set forth the "who,
what, when, and where" of the alleged defamatory statements with sufficient particularity to
"give Defendants fair notice of the factual basis for Plaintiff's defamation claim." Hogan v.

Teamsters Loc. 170, 495 F. Supp. 3d 52, 62 (D. Mass. 2020); see also Educadores

Puertorriqueños en Accion v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004) ("[T]he complaint

should at least set forth minimal facts as to who did what to whom, when, where, and why—

although why, when why means the actor's state of mind, can be averred generally.").  To

demonstrate fault, Plaintiffs must show that Defendants acted negligently in publishing the

defamatory falsehood.  Jones v. Taibbi, 512 N.E.2d 260, 269 (Mass. 1987) (citing Stone v. Essex

Cnty. Newspapers, Inc., 330 N.E.2d 161, 168 (Mass. 1975)).

Plaintiffs bring their claim for defamation on the basis that "[t]he Company intentionally

and/or recklessly informed prospective customers of SPIN . . . that Bryan had stolen" Company

documents and information, which she was using for SPIN.  [Am. Compl. ¶ 171]; see also [id.

¶¶ 170–77 (Count III)].  The Court previously held that "the majority of Plaintiffs' allegations do

not meet the notice pleading requirements of Rule 8 because they fail to plead sufficient facts to

give Defendants fair notice of the statements at issue."  [ECF No. 35 at 20].  Plaintiffs argue that

they have cured this defect by alleging "additional facts concerning the nature of the defamatory

statements and to whom, when, and how they were communicated." [ECF No. 56 at 28].  That

said, Plaintiffs point the Court to no such facts, and the Court's diligent review of the Amended

Complaint has not revealed any.[7]  Although this could end the analysis, the Court also notes that

Plaintiffs once again failed to plead that anyone who made the allegedly defamatory statements

acted negligently as to their veracity.  [ECF No. 35 at 21].  Thus, even if the Amended

---

[7] To the extent that Plaintiffs intended that their allegation that "two of the Company's
representatives at the OADN were openly discussing Bryan's alleged theft," [Am. Compl.
¶ 143], to be an additional defamatory statement, Plaintiffs have again failed to plead sufficient
facts as to who made the statements or what was said, as required by Rule 8, as well as to plead
any facts to indicate that the speakers were at least negligent in making the statement.

Complaint had pled enough additional facts to satisfy Rule 8, Plaintiffs' defamation claim would still fail to plead fault.  See [Am. Compl.]; [ECF No. 56].  As such, Defendants' motion to dismiss Count III is **GRANTED**.

### D.    Commercial Disparagement (Count IV)

Plaintiffs' claim for commercial disparagement, predicated on the same facts as their defamation claim, fails for similar reasons.  [Am. Compl. ¶¶ 178–82 (Count IV)].  "[I]n order to prevail on a claim alleging commercial disparagement, a plaintiff must prove that a defendant: (1) published a false statement to a person other than the plaintiff; (2) 'of and concerning' the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss."  HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013).  The Massachusetts Supreme Judicial Court "has noted that the knowledge standard required to prove commercial disparagement 'mirrors what has been termed "actual malice" in the defamation context.'" Lemelson v. Bloomberg LP, 253 F. Supp. 3d 333, 341 (D. Mass. 2017), aff'd, 903 F.3d 19 (1st Cir. 2018) (quoting HipSaver, 984 N.E.2d at 529–30).  The Court's First Motion to Dismiss Order dismissed Plaintiffs' defamation claim on the grounds that, pursuant to the defamation analysis, Plaintiffs had failed to sufficiently plead that "any allegedly false statement was published with negligence, much less with actual malice."  [ECF No. 35 at 23].  As discussed supra, this remains true.  Therefore, Defendants' motion to dismiss Count IV is **GRANTED**.

### E.    Mass. Gen. Laws Ch. 93A (Count V)

Plaintiffs again bring a claim for violations of Mass. Gen. Laws ch. 93A.  [Am. Compl. ¶¶ 183–86 (Count V)].  Plaintiffs do not provide an independent basis for the 93A violations,

alleging only that "[t]he actions of the Defendants, as alleged above, constitute fraudulent or unfair business practices and unfair competition within the meaning of" 93A.  [Id. ¶ 184].  To state a 93A claim, Plaintiffs, among other things, "must show that [D]efendants' actions: '. . . fall within the penumbra of some common-law statutory, or other established concept of unfairness[.]'"  Albright v. Morton, 321 F. Supp. 2d 130, 141 (D. Mass. 2004) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999)), aff'd sub nom. Amrak Prods., Inc. v. Morton, 410 F.3d 69 (1st Cir. 2005).  This Court previously dismissed Plaintiffs' 93A claims because they "rest on the same conduct that underlies its failed antitrust and state tort law claims, and thus also fails to state a claim under 93A."  [ECF No. 35 at 24 (citing Albright, 321 F. Supp. 2d at 141–41)].  As Plaintiffs have not alleged any new facts specific to their 93A claim in the Amended Complaint and their antitrust and state tort claims still fail, Plaintiffs once again do not state a claim under 93A.  Accordingly, Defendants' motion to dismiss Count V is **GRANTED**.

### F.    Injunctive Relief (Count VI)

Plaintiffs again bring a claim for "injunctive relief."  [Am. Compl. ¶¶ 187–89 (Count VI)].  This Court's prior order noted that "[i]njunctive relief . . . 'is not a stand-alone cause of action under Massachusetts or federal law.'"  [ECF No. 35 at 24 (quoting O'Brien v. Wilmington Tr. Nat'l Ass'n, 506 F. Supp. 3d 82, 92 (D. Mass. 2020))].  As such, Defendants' motion to dismiss the standalone count for injunctive relief (Count VI) is **GRANTED**.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss for failure to state a claim is **GRANTED** with prejudice.

**SO ORDERED.**

August 6, 2025                                    /s/ Allison D. Burroughs
                                                 ALLISON D. BURROUGHS
                                                 U.S. DISTRICT JUDGE